## In Re WILMARTH

### (172 N. W. 921).

(File No. 4293.  Opinion Filed June 17, 1919).

1.  **Disbarment—Claim Against Estate, Administratrix's Attorney, Non-Disclosure of Claim's Rejection, By—Resisting Re-opening of Claim—Effect re Professional Ethics.**

    Where findings in a disbarment proceeding showed that respondent, attorney for administratrix, withheld from C's knowledge the fact that its claim, upon the coming in of administratrix's report on claims, was rejected by county court; it not having received notice of such hearing, C having thereafter on various occasions inquired by letter, from respondent, as to the status of the claim, he having, nearly a year from its rejection, informed C that it had been disallowed; and thereafter resisted C's application for vacation of the disallowed order, and having appealed from an order vacating the original order, and after affirmance of the vacating order on appeal, appealed therefrom to Supreme Court, where the vacating order was again affirmed; it appearing that respondent had knowledge, some three weeks after the disallowing order, that C believed its claim had not been passed on, and knew, or should have known, that such belief was induced by his previous letter to C; held, that respondent's conduct in resisting the opening of the disallowing order was unethical and in violation of his duty as an attorney.

2.  **Same—Whether Respondent Intentionally Misled C—Additional Findings, Whether Necessary.**

Held, further, that, the natural inference deducible from Referee's findings being, that for nearly eleven months after rejection of C's claim respondent purposely misled it, and that his sole object was either to defeat the claim or effect a compromise, therefore a further finding that, in his correspondence with C, respondent intentionally undertook to and did mislead C to believe its claim had neither been allowed nor rejected, was unnecessary.

3. **Disbarment—Advising Defendant in Court After Retainer by Plaintiff—Finding Re, Refused—Non-error Under Conflicting Evidence.**

Where, in a disbarment proceeding, evidence was conflicting and referee refused to find that respondent attorney advised defendant in justice court case, after respondent had been retained by plaintiff, and that defendant therein did not know plaintiff had retained him, such refusal to find was proper.

4. **Disbarment—Representing Complainant in Criminal Action and in Civil Action Involved—Justice Suit, Endorsing Another Attorney's Name on Summons, Receiving Attorney's Fees re Suit—Executrix's Attorney, Misleading Claimant re Rejection of Claim—Counselling Complainant re Prosecution for Assault, Trying Damage Suit for Assaulted Party—Statute Forbidding Maintaining Criminal and Civil Suits on Same Facts, Ignorance Of—Facts Considered—Disbarment Proceedings, Purpose of, Not Penal, But Society's Protection—Clear Case Necessary to Disbarment—Non-Judgment of Disbarment Affirmed.**

Where, in a disbarment proceeding, the evidence and findings showed in substance, that in 1918, and while state's attorney, respondent instituted two criminal actions, that during their pendency he, as attorney for party complainant in the criminal action, represented him in a civil suit brought against the party defendant in the criminal action, each civil suit depending substantially on the same facts involved in the criminal actions; that in 1912, being retained to bring suit in justice court, he as had often been his professional practice, turned over to a younger attorney said case endorsing the latter's name as attorney on summons, not endorsing his own, and after case was settled, charged the client $10 for services, dividing same with the other attorney; that in 1914, he being administratrix's attorney, one C's claim of $3020 against the estate was presented and endorsed by administratrix as having been received, that subsequently on filing her report in claims, said claim was indicated "not allowed," that in January, 1915, on hearing of said report, notice of which had been mailed the claimants, C not having received such notice, an order was made rejecting said claim, that in reply to C's letter of inquiry respondent by

letter of January, 1915, stated the claim had neither been allowed nor rejected, further correspondence as to status thereof continuing until the following December, when respondent for the first time advised C's attorneys that claim was disallowed January 4, 1915; 'that thereafter respondent resisted C's motion to vacate the order of disallowance, and appealed to circuit court from an order vacating said original order, and thereafter appealed to Supreme Court from the latter's judgment affirming the county court; evidence showing respondent, on January 27, 1915, had knowledge that C believed its claim had not been passed on, and knew or should have known this belief was induced by his said initial letter; that in 1915 respondent was applied to by one B, who was in difficulty with one H, and retained respondent to defend him in the event that H should prosecute him for assault with a dangerous weapon, it not appearing however that he detailed to him what he claimed were facts in the difficulty, no prosecution having subsequently occurred, respondent having subsequently sued B for fees under such retainer, and having received $35 and costs therefor; that, in a subsequent suit by H against B for $5000 damages for such assault, respondent, in whose hands the case had been placed by M, plaintiff's attorney, before trial, M being physically indisposed, which case was tried for plaintiff by respondent, he having previously and before the trial received from B a letter denouncing his proposed course in appearing for H; and having on said trial examined B as an adverse party, and cross-examined him when testifying in his own behalf; that respondent was not aware of Sec. 938, Pol. Code, when, as state's attorney, he maintained said criminal and civil actions, which said section forbids, that the referee criticized respondent for endorsing said other attorney's name on the summons and keeping his own relation to the case undisclosed, suggesting that such action might be violative of Pen. Code, Sec. 214, forbidding an attorney from suing out process in another attorney's name; referee having found that respondent's said initial letter to C had misled C; that respondent must and should have seen that C believed its claim had not been passed upon, and it became his plain duty to unequivocally informed C of the exact situation before date for appeal from said rejecting order had expired; that he should not have contested to the last C's said application to have the matter re-opened on ground of its being misled by said communication from respondent's office; referee having further held respondent should not have appealed in his behalf in said damage suit after receiving B's denounciatory letter, and that such conduct was violative of Sec. 6 of Canons of Professional Ethics adopted by American Bar Association and the Bar Association of this state. Said findings and conclusions

of referee are confirmed.  **Held,** under said facts, that referee's conclusions that judgment of disbarment should not follow, are concurred in, not however on referee's stated grounds, viz.: That "disbarment is too severe a penalty"; a disbarment proceding being civil, not a criminal proceding, the sole question to be determined being, the then fitness of respondent to be entrusted with duties and responsibilites incident to an attorney's position, judgment of suspension or disbarment not being imposed as a penalty, but merely for society's protection. **Held,** further, that inasmuch as judgment of disbarment entails not only great financial loss—oftimes destroying one's only means of livelihood—and brings disgrace and humiliation partaking of the nature of, and oftimes equalling or exceeding the punishment inflicted for breaches of penal laws, courts should hesitate either to disbar or suspend one from such practice; it should be done only when it is clear the protection of society requires, or where maintenance of due regard for courts and judges, or respectability of the legal profession, demands such action; especially when, as in present case, respondent has continuously practiced law in and been a resident of one city for over 35 years, and gained, as shown by evidence of a great number of his fellow citizens, an enviable reputation both as fellow citizen and as attorney; and there being no finding or proof that he ever sought financial gain through unprofessional conduct.

**5.    Same—Representing, as State's Attorney Said Witnesses re Civil Actions Involved, Whether Improper—Effect.**

The fact that respondent, nearly 10 years before commencement of disbarment proceedings, represented 2 complaining witnesses in civil actions based upon same facts as pending criminal actions prosecuted by him as state's attorney, no improper motive therefor existing, and he being ignorant of the statute (Pol. Code 1903, Sec. 938) forbidding such action, gives little support to a charge of present unfitness to practice, it revealing no moral turpitude.    The Court however disagrees with respondent's contention that, independent of the statute, it would not be unethical or unprofessional for a state's attorney to conduct both a civil and criminal action based on same facts, provided he did not use "the information he receives in a criminal action as a basis for forcing a settlement in the civil matter."

**6.    Same—Attorney's Surplus Business to Another Attorney, Signing Latter's Name On Summons, Whether Unethical.**

There was no wrong whatsoever in respondent's turning to another work he had not time to perform, or in his preparing papers for such other attorney, endorsing latter's name thereon, and delivering such papers to him; that nevertheless, so long as respondent still considered himself interested in such suit and entitled to share in the fees earned, he should have en-

dorsed thereon his own name with that of his associate, though his failure to do so in absence of wrong motive therefor is little if any proof of preesnt unfitness to practice law.

7. **Same—Appealing for Plaintiff in Damage Suit After Retainer by Defendant as Prospective Criminal Complainant re Same Facts, Effect re Professional Ethics—Ethics, Rule Construed—Complainant's Discredited Testimony, Effect.**

Respondent is censorable for so appearing on behalf of H, · in his suit against B, after retainer by B to defend him in case he was so prosecuted criminally; and this regardless of whether B had disclosed to him what he claimed to be the facts of the case; nor did the fact that respondent had to sue B for his retainer fee relieve him of his duty under such retainer, it being his clear duty to have disclosed to court and opposing counsel the fact of such retainer, and then not to have appeared for H unless court and B consented thereto. But the gravity and moral turpitude disclosed by his misconduct is measurable largely by degree of advantage he was taking of B, this latter depending upon disclosures B made to him. Held, further, that referee's opinion that B had made full statement to respondent of facts and circumstances connected with the affair giving rise to the damage suit, is not sustained by the evidence. Such finding being supported only by B's thoroughly discredited testimony. However, had such been the case, respondent's appearance for H, calling and examining B as his adverse party and cross examining him when he testified in his own behalf, would be most reprehensible and directly violative of 6th Canon of Ethics adopted by American and South Dakota Bar Associations, reading as follows: "The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed"; therefore held, that while respondent should not have appeared against B without B's consent, yet he was not in position to take any unfair advantage—a matter most material to question of moral turpitude.

8. **Same—Executrix's Attorney, Misleading Claimant re Claim's Rejection—Referee's Findings Confirmed—Professional Duties· re Client and Court, Defined.**

The referee's findings concerning respondent's action relating to said claim against the estate are justified; that while he owed no affirmative duty to C, it was his duty to studiously refrain from intentionally misleading C, an attorney's duty not permitting, much less demanding of him for any client violation of law, or any manner of fraud or chicane (15th Canon of Ethics), his duty to client demanding no more than an honest

effort to secure justice for him; it does not permit nor excuse a resort to deception to procure for him even that to which the attorney honestly believes him entitled; that when it was disclosed that he had even innocently misled C he should have refused to oppose vacation of county court's order, leaving it to administratrix to employ other counsel if she desired to prevent opening up of the original order; nor can respondent, simply because he thought C should compromise, justify his sworn statement that "When they did not settle and put up the fight, then I put up the best fight I could to beat them and they would settle."

9. Same—Attorney's Faithful Work re Clientele—His Overzealousness for Client, Criticized—Guilty of Much Wrong Charged, Effect, re Costs.

The fact that respondent is a tireless worker and faithful to his client's cause is not disputable; but he is inclined to be over zealous; often forgetting, in such zeal his duties as an officer of court; which inclination doubtless led him to err in the matter of his misleading information re the claim against the administratrix; is inclined to forget it is the clients, not the attorneys who are litigants; that however the Court are not convinced the best interests of society, respect due the courts, or respectability of the legal profession demands respondent's suspension, though in so erring he had laid himself open to just censure. Having every confidence that this proceeding will tend to bring him to clearer realization of the dignity and importance of his position as an officer of the courts—sharing with other officers in any blame for failure of courts to attain their purpose, justice between man and man,—confidence is entertained that in future he will conduct himself as behooves a member of the bar. Held, further, that, as he was guilty of much of the wrong conduct charged, he should pay one-half the necessary disbursements incurred on behalf of prosecution.

10. Disbarment—Complainant, Bad Faith re Charges, His Testimony Discredited, Effect, re Costs.

Believing that complainant in a disbarment proceeding, was not acting in good faith concerning charges by him made against respondent involving moral turpiture, and having found such parts of the charges unfounded, complainant is adjudged to pay one-half the necessary disbursements incurred on behalf of prosecution.

Original proceeding. In the Matter of the Disbarment of A. W. Wilmarth, an Attorney.

State's demand of judgment of disbarment, or suspension, refused. Judgment of censure of respondent.

*Byron S. Payne,* Attorney General, and *Clarence C. Caldwell,* for the State.

*T. H. Null, Kelley & Byrne,* and *C. P. Warren,* for Respondent.

WHITING, J. This is an original proceeding instituted upon the complaint of Jacob C. Hatfield and John H. Boots and seeking the disbarment of A. W. Wilmarth, a duly licensed practitioner before this court. Pursuant to statute the Attorney General has charge of the prosecution. The issues were referred for trial to a referee selected by the Attorney General and respondent. The referee has reported findings of fact and has recommended that respondent be suspended from practice for the period of 1½ years. The Attorney General has moved for additional findings and a judgment of disbarment. Respondent moves for a dismissal of the charges. The findings of the referee are, so far as material, as follows:

Respondent is now, and has been ever since 1883, an attorney and counselor at law duly admitted to practice in all the courts of this state, and he has practiced during all of that time at Huron.

In the year 1908, and while state's attorney in and for Beadle county, respondent instituted two certain criminal actions. While each of such criminal actions was pending and undetermined, respondent, as attorney for the party complainant in the criminal action, represented such party in a civil action brought against the party who was defendant in the criminal action. Each civil action depended substantially upon the same facts upon which the corresponding criminal action was based.

In 1912 respondent was retained to bring a certain civil action in justice court. There was a younger attorney at Huron to whom respondent often turned over justice court cases for trial. In this particular matter respondent prepared the papers, including the summons, and indorsed this other attorney's name thereon as attorney and did not indorse his own name thereon. This other attorney took the papers to the justice, who signed and issued them, and such attorney delivered them to the constable for service. The case was settled before trial by the payment into court of the amount of the claim and costs not including statutory attorney fees. A controversy afterwards took place between

respondent and the justice as to whether attorney fees were taxable, but respondent finally accepted the amount of the claim and receipted for it in the justice docket. Respondent charged his client $10 for services and divided said $10 with the other attorney.

[1]   In 1914 administration proceedings on the estate of one Stroup were pending in the county court of Beadle county. Respondent was attorney for the administratrix. About October 2d, one C.'s claim of $3,020 against the estate was presented to the administratrix. The claim was indorsed by the administratrix, "Received October 3, 1914." On December 18th the administratrix filed her report on claims, in which C.'s claim was indicated "Not allowed." January 2, 1915, was appointed as the day for hearing the report on claims. Notice of the time and place of this hearing was mailed to the several claimants and among others a notice appears to have been mailed, or was intended to have been mailed, to C. However, C. did not receive such notice. On January 4, 1915, an order was made by the county court adjudicating the claims, and C.'s claim was wholly rejected and disallowed. This order was filed January 5, 1915. Not having heard what disposition was made of its claim, C., on January 16th, wrote respondent that, as he was attorney for the administratrix, they would appreciate information as to the standing of their claim. In reply C. received a letter dated January 18th (Exhibit 31) written on respondent's stationery and purporting to be signed by him, stating that the claim had neither been allowed nor rejected. Further correspondence between C. and respondent occurred up to about the last of May, 1915, from which correspondence C. was warranted in believing that its claim had not yet been passed upon. On December 7, 1915, C.'s attorney wrote inquiring as to this claim, and in response to this the respondent, on December 9th, advised them that the claim was disallowed January 4, 1915. This was the first notice C. had that the claim had been disallowed. Thereafter, by its attorneys, C. moved the county court to vacate the order disallowing the claim, which motion was resisted by respondent on behalf of the administratrix. The county court vacated the order of disallowance and fixed a date for the further consideration of the claim. From this order an appeal was taken by respondent, on behalf of the administra-

trix, to the circuit court, where the order was affirmed, and from such affirmance respondent, as attorney for the administratrix, appealed to the Supreme Court, where the order or judgment of the county court opening up the case for consideration was again and finally affirmed. On January 27, 1915, respondent had knowledge that C. believed that its claim had not been passed on and knew, or should have known, that this belief was induced by the letter, Exhibit 31. Respondent's conduct in resisting the application to open up the judgment disallowing this claim was, under all the circumstances, unethical and in violation of his duty as an attorney.

On or about January 12, 1915, Boots, one of the complainants herein and a resident of Huron, went to his farm on some business. While there he got into difficulty with one Hansen in the course of which trouble a revolver carried by Boots was discharged. After his return to town Boots went to respondent's office and retained respondent to defend him in the event that Hansen should prosecute him for assault with a dangerous weapon. To enable respondent to prepare for such defense Boots detailed to respondent what he claimed were the facts in the difficulty that had taken place between him and Hansen. No prosecution for assault was instituted against Boots and on March 10, 1915, respondent wrote Boots requesting payment of $25 for his services. Boots not having paid this, respondent on October 18, 1915, sued him in the justice court for the sum of $100, which suit was settled by the action of $35 and the costs of the action. On November 10, 1915, an action was commenced in the circuit court of Beadle county by Hansen against Boots for $5,000 damages for alleged assault occurring in the difficulty hereinbefore referred to. This action was commenced by one M., as attorney for the plaintiff, and was brought on for trial at the June, 1916, term of said court. Before the convening of this term M. found that, owing to the condition of his health, he would be unable to try cases at that term, and he procured respondent to try such of his cases as would come to trial at that term, including the case of Hansen v. Boots. Boots in some manner learned that the respondent intended to try this case on behalf of Hansen and wrote him a letter denouncing his proposed course in appearing for Hansen after having been his

(Boots') attorney in the criminal matter. Respondent received this letter before the commencement of the trial of the case of Hansen v. Boots, but tried the case as attorney for Hansen. In the course of the trial respondent called Boots for examination as an adverse party. He examined him at length in regard to his relations with Hansen, and in regard to the details of the occurrence between him and Hansen on which the action was based. He also cross-examined Boots at length in regard to the same matter when Boots was called as a witness on the defense.

Respondent testified that he was not aware of section 938, Pol. Code, when, as state's attorney, he maintained criminal and civil actions based upon same state of facts. Said section 938 forbids such practice. It has been in force since 1883. The referee finds that respondent's ignorance of this statute does not excuse its violation.

The referee criticises respondent for indorsing the name of the other attorney on the summons in justice court and in keeping his own relation to the case undisclosed. The referee suggests that such action might be deemed a violation of section 214, Penal Code. Such section forbids an attorney allowing any person, other than his partner or clerk, to sue out process in the attorney's name, and said section makes both the attorney and the other party criminally liable.

The referee finds that Exhibit 31 would naturally mislead C., who would take it to be a communication from respondent himself; that C. was misled was shown by the answer to Exhibit 31 which answer respondent conceded he received and read; that respondent must have and should have seen that C. believed its claim had not been passed upon; that it became respondent's plain duty to have unequivocally informed C. as to the exact situation; that he should not have allowed it to remain in ignorance of the true situation until time for appeal from the order rejecting the claim had expired; and that he should not have contested to the last C.'s application to have the matter reopened, such motion being based on the ground that C. had been misled by the communications received from respondent's office.

The referee held that respondent should not have appeared on behalf of Hansen in the trial of Hansen v. Boots, and especially so after receiving the letter from Boots denouncing such

proposed course; and held that such conduct was a violation of section 6 of the Canons of Professional Ethics adopted by the American Bar Association and the Bar Association of this state.

[2] The Attorney General asks this court to find that the defendant in the justice court case sought and received advice from respondent after respondent had been retained by the plaintiff, and that, at that time, such defendant did not know that respondent had been retained by plaintiff. The evidence was conflicting and the referee did not err in refusing the finding now sought.

[3] The Attorney General also asks us to find that, in respondent's correspondence with C. in relation to the Stroup estate, respondent intentionally undertook to lead C. to, and did lead it to, believe that its claim had neither been allowed nor rejected; and that respondent's purpose was to put C. in a position where a compromise settlement could be effected. We think the natural inference to be drawn from the referee's findings is that from January 27, 1915, on, respondent purposely misled C., and that his only object was either to defeat the entire claim or effect a compromise. We are therefore of the opinion that the findings requested add nothing to the referee's findings.

[4] We fully concur in the conclusion of the referee that there should not be a judgment of disbarment herein. We do not place this conclusion, as does the referee, on the ground that "disbarment is too severe a penalty." This court has repeatedly held that a disbarment proceeding is civil and not criminal; that the sole question to be determined therein is the then fitness of the respondent to be intrusted with the duties and responsibilities incident to an attorney's position; and that a judgment of suspension or disbarment is not imposed as a penalty but merely for the protection of society. In re Egan, 36 S. D. 228, 154 N. W. 521; In re Van Ruschen, 38 S. D. 254, 160 N. W. 1006.

But, inasmuch as a judgment of disbarment from the practice of an honorable profession entails not only great financial loss—ofttimes destroying one's only means of livelihood—and in all cases brings disgrace and humiliation, thus partaking of the nature of, and ofttimes equaling or even exceeding, the punishment inflicted for breaches of our penal laws, courts should always hesitate either to disbar or even to suspend one from such

practice—certainly it should only do so when it seems clear that the protection of society requires such action, or when the maintenance of the respect due courts and judges or of the respectability of the legal profession itself demands such action. State v. Kirby, 36 S. D. 188, 154 N. W. 284. This is especially true where, as in the present case, the party charged with unfitness to hold a license as an attorney has continuously practiced law in and been a resident of one city for over 35 years, and gained, as the evidence of a great number of his fellow citizens' attest, an enviable reputation both as a citizen and as an attorney. We would especially call attention to the fact that there is no finding, and certainly no proof, that respondent ever sought financial gain through unprofessional conduct.

[5] The fact that respondent, nearly ten years before the commencement of this proceeding, represented two complaining witnesses in civil actions based upon the same facts as pending criminal actions prosecuted by him as state's attorney, no improper motive therefor being found to have existed and respondent being ignorant of the statute forbidding such action, gives little support to a charge of present unfitness to practice. It reveals no moral turpitude. But we do not agree with respondent that, independent of the statute, it would not be unethical or unprofessional for a state's attorney to conduct both a civil and a criminal action based upon the same facts, provided he did not use "the information he receives in a criminal action as a basis of forcing a settlement * * * in a civil matter."

[6] We are unable to recognize any wrong whatsoever in respondent's turning over to another work that he had not the time to perform, or in his preparing papers for such other attorney, indorsing such attorney's name thereon, and delivering such papers to such other attorney. We are, however, of the opinion that, so long as respondent still considered himself interested in the matter so turned over and entitled to share in the fees earned, he should have indorsed his own name on the summons together with the name of his associate; but the mere fact that he failed to so indorse his name, in the absence of a wrong motive therefor, is little, if any, proof of present unfitness to practice law.

[7] Respondent must be censured for appearing on behalf of Hansen, in the action of Hansen v. Boots, after having been

retained by Boots to defend him in case he was prosecuted criminally, and this censure is due regardless of whether Boots had disclosed to him what he claimed to be the facts of the case. Certainly the fact that respondent had to sue Boots to recover his retainer fee did not relieve respondent of his duty under such retainer. It was clearly respondent's duty to have disclosed to the court and to opposing counsel the fact of such retainer, and then not to have appeared for Hansen unless the court and Boots consented thereto. But the gravity of respondent's misconduct, the moral turpitude disclosed thereby, is to be measured largely by the extent of the advantage which he was taking of Boots, and this depends upon the disclosures which Boots had made to him. It is apparent that the referee was of the opinion that Boots had made a full statement to respondent of the facts and circumstances connected with the shooting affair—the referee finding that "to enable defendant [respondent] to prepare for such defense Boots detailed to defendant what he claimed were the facts in the difficulty that had taken place between him and Hansen."

If such were the facts, respondent's appearing on behalf of Hansen, calling and examining Boots as an adverse party, and cross-examining him when he took the stand in his own behalf would be most reprehensible and in direct violation of that part of the Sixth Canon of Ethics adopted by the American and South Dakota Bar Associations, reading as follows:

"The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed."

But such finding has no support except in the testimony of Boots, one of the complainants in this proceeding, which testimony was corroborated in some particulars by Mrs. Boots. Boots testified that on the day of this trouble he reached Huron in the evening; that he was sick and unable to and did not go up town that evening; and that the next day he went to respondent's office, retained him, and had a long interview at which he related fully the facts and circumstances connected with the shooting affair. Mrs. Boots testified that Boots reached home late and

that he did not go up town that evening. The testimony of respondent, corroborated by that of several other witnesses, was to the effect that Boots came to town some time during the afternoon; that he went to respondent's office and in a general way advised respondent of the nature of the trouble he had had, but did not go into the facts and circumstances; that he expressed a desire to see the state's attorney before Hansen did; that he was at respondent's office but a very few minutes at most and left with the avowed purpose of seeing such state's attorney; that he saw the state's attorney that same afternoon; and that he did not see respondent the next day. The case of Hansen v. Boots was before us upon appeal. 168 N. W. 798. The original record in that cause is also before us in the present proceeding. The testimony of Boots upon the trial of that cause, at which trial there could have been no motive leading either him or his wife to swear falsely as to the facts we are now considering, tends to prove that he must have reached Huron by the middle of the afternoon. The direct statement of Mrs. Boots was that he reached home about "the middle of the afternoon—much earlier than I expected him." She also testified that she did not believe that he went up town the next morning.

Furthermore, in his written complaint, signed and sworn to, and upon which this proceeding is based, Boots says: "That thereupon your complainant immediately left said farm, and * * * at once proceeded to the office of the said A. W. Wilmarth in Huron." And at another place in said complaint Boots refers to his interviews with respondent "on the date on which said encounter took place and on the following day."

[6] Boots conclusively proved himself unworthy of credence and wanting in good faith in his connection with this case by his testimony given in relation to his name. The summons and complaint in Hansen v. Boots were introduced in evidence. In such exhibits Boots' name was given as "John H. Boots." He was asked if that was his correct name and he answered "No." He testified that his correct name was J. Homer Boots; that his first name was not "John" but simply "J."; that he was not commonly called "John H. Boots"; that "there have been only two people in my knowledge; one, Mr. Wilmarth, a few years ago called me John H. Boots and one Terry McMillen—he's out

in Hot Springs"; that no one else in Huron except respondent called him "John." The inference to be drawn from the facts so testified is clear—if the only one at Huron who called him "John" was respondent, then respondent must have had to do with the preparation of the summons and complaint in Hansen v. Boots. In other words, Boots desired to convince the referee that respondent not only improperly appeared upon the trial of Hansen v. Boots, and improperly examined him, but that respondent had been connected with Hansen v. Boots from its inception, willfully keeping in the dark and having 'M. to appear as the attorney of record. Boots denies that in the case of Hansen v. Boots he testified his name was "John H. Boots," and yet the record in that case shows that, in answer to the question "State your name" he answered "John H. Boots." In Hansen v. Boots he signed and had filed in court an affidavit reciting "John H. Boots being first duly sworn, * * *" etc., and signed "John H. Boots." In the beginning of the sworn complaint upon which this prosecution rests, he named himself "John H. Boots," and in the body of such complaint he referred to himself as "John H. Boots," and he signed such complaint "John H. Boots." In the light of the above we have no hesitancy in saying that Boots' testimony should be disregarded, and in holding that Boots never had an interview with respondent in which he related to respondent the details of the facts and circumstances connected with the shooting affray.

It follows that, while respondent should not have appeared against Boots without Boots' consent, yet he was not in a position to take any unfair advantage—a matter most material to the question of moral turpitude.

[8] We are in full accord with the referee in his findings in relation to respondent's conduct in the Stroup estate. While he owed no affirmative duty to C., it was his duty to studiously refrain from intentionally misleading C.

"The office of attorney does not permit, much less does it demand of him for any client, violation of law or any manner of fraud or chicane." 15th Canon of Ethics.

The duty of an attorney to his client demands nothing more than an honest effort to secure justice for such client; it does not permit, neither does it excuse, a resort to deception to procure

for a client even that to which the attorney honestly believes his
client entitled. If, as claimed by respondent, he did not inten-
tionally mislead C., yet when it was disclosed that he had, even
though innocently, misled it, he should have refused to oppose the
vacation of the county court's order, leaving it to the administra-
trix to employ other counsel if she desired to attempt to prevent
the opening up of the county court's order. C. had a right to
have the merits of its claim passed on by the court. Respondent,
simply because he thought C. should make a compromise settle-
ment, cannot justify the following position he announced when
testifying:

"When they would not settle and put up the fight, then I
put up the best fight I could to beat them and they would settle."

[9] The writer of this opinion was for several years the
judge of the trial court at Huron. We believe that we came to
know both respondent's strong and his weak points. That he is
a tireless worker and faithful to the cause of the client he is
serving none will dispute; but, as was frankly conceded by his
counsel in their arguments before this court, respondent is inclin-
ed to be overzealous. In his zeal for his client he often forgets
his duties as an officer of the court. This undoubtedly led him
to err in the Stroup matter where, in seeking the end desired, he
lost sight of the nature of the means used to reach such end. He
is inclined to forget that it is the clients and not the attorneys
that are litigants. But we cannot hope for perfection even among
the members of our profession, and we are not convinced that the
best interests of society, the respect due the courts, or the respect-
ability of the legal profession demands the suspension of respon-
dent. He has erred and has laid himself open to just censure.
However, we have every confidence that this proceeding will
tend to bring respondent to a fuller and clearer realization of the
dignity and importance of his position as an officer of the courts
—an officer who must and should share with the other officers in
any blame for the failure of courts to attain that for which they
have been created, the attainment of justice between man and
man. We have full confidence that respondent will, in the future,
conduct himself in all respects as behooves a member of a most
honorable profession. But while we do not believe that respon-
dent should be disbarred or even suspended, yet, as he was guilty

of much of the wrong conduct charged, we feel that he should pay one-half of the necessary disbursements incurred on behalf of the prosecution.

[10] Believing as we do that the complainant, John H. Boots, was not acting in good faith in those charges made by him against respondent which involved moral turpitude, and having found such parts of those charges unfounded, we are of the opinion that he also should pay one-half of the necessary disbursements incurred on behalf of the prosecution.

Judgment will enter accordingly.