## In re EGAN.

Evidence **held** to warrant the modification of a judgment of disbarment of an attorney.

In the matter of the petition of George W. Egan, an attorney, for the vacation or modification of a judgment of disbarment. Modified.

*Muller & Conway.* for petitioner.

HANEY, J. On November 15, 1907, after consideration of the application of the petitioner in the pending proceeding, the objections thereto, and the evidence then on file, it was ordered that the applicant, upon taking and filing the required oath, be admitted and licensed to practice as an attorney and counselor at

law in all the courts of this state, provided, however, that such order should not preclude disbarment proceedings based upon the conduct of the applicant concerning the transfers of certain property to him by one Julia Ann O'Grady, mentioned in the objections to his admission, if it should thereafter be determined by a court of competent jurisdiction that such transfers ought to be canceled on the ground of fraudulent procurement; Corson, J., taking no part in the decision. The transfers alluded to in such order having been adjudged to be fraudulent, and an accusation based on the petitioner's connection therewith having been heard on October 10, 1908, his name was stricken from the roll of attorneys. In re Egan, 22 S. D. 355, 117 N. W. 874. On December 1, 1909, the petitioner's application to be reinstated was denied. In re Egan, 24 S. D. 301, 123 N. W. 478. On July 9, 1910, a petition was filed praying that the judgment of disbarment be vacated or so modified as to be a suspension for a specified period, or that the petitioner be reinstated. On July 26, 1910, a supplemental petition praying for the same relief was filed. After referring to the petitioner's admission, disbarment, and the denial of his application for reinstatement, this supplemental petition proceeds as follows: "(3) That he has no means for procuring a livelihood except by the practice of law. That he has, by reason of his disbarment, practically exhausted whatever property or estate he possessed at the time he settled in Sioux Falls. That although he has been publishing a weekly newspaper since January 1, 1909, it has not been the source of any considerable profit and is not in line with the bent of his ambition or training. Your petitioner, however, recognizes that what is contained in this paragraph is not in itself a ground or reason for the relief he seeks, but is only stated for the purpose of presenting the fact that he really desires to resume the practice of his profession. (4) That he is now aware that he has not, by his conduct toward the judiciary of this state, at all times, recognized his duty as a member of the profession. That he has been hasty, inconsiderate, and unfair he admits; nor does he undertake to excuse himself or justify his shortcomings by resort to recrimination against any

tribunal or individual. That he was blinded as to his plain duty to uphold the courts of his state he can now see. That for all he has done and all he has said and all he has printed, which might be construed as reflecting upon this court or any individual member of it, he apologizes, and in so doing he knows that he honors himself. That he trusts his apology will be accepted as the utterance of one who speaks from a heart lightened by the fact that it has been spoken. That in the use of the term 'apologizes' he means it in no restricted or limited, but in the broadest sense; that he intends thereby to and he does retract each and every statement and charge that he has made derogatory to the court, individually and collectively, whether the same was such as to imply partiality, bias, corruption, or incompetency, or to hold any member thereof, or the court as a whole, up to ridicule or contempt by direct utterance, insinuations, or innuendos. (5) That, as a citizen who appreciates the majesty of the law, he desires to be understood as submitting to every judgment and decree that has been entered against him in the unpleasant litigation in which he has been a party. That in saying this he is stating what it is the duty of every litigant to do who has had his day in the courts constituted by authority. (6) Believing that this court will give credence to his apology, and will consider that sufficient punishment has been endured, and amends made for errors committed and discourtesies shown the courts of this state, he asks that this petition be filed, and that an order be granted fixing a time for the hearing thereof, which order may be served upon any state or county bar association or individual attorney that the court may care to give notice to."

On the hearing of the petition, after making an extended statement, the petitioner, who was sworn and examined by the presiding judge, testified as follows: "Q. In reading your petition, and from what you have already stated, I take it that it was your intention not only to apologize to the court, but to retract anything that you may have said that in any way reflected upon the integrity of the court? A. That was my intention at the time I filed the petition, and is my intention now. Q. And, in so re-

tracting, do you do it believing at this time that such action as may have been taken by this court in any of the proceedings concerning which you may have criticised the action of the court was done conscientiously by the court, without any prejudice as against you, or any wrongful influence from the outside, or wrong motive on the part of the court? A. I had that in my heart and mind, and have it now, to retract in that sense. Q. And you do believe, do you, at the present time, that this court has acted conscientiously, from proper motives, in all that it may have done, whether in or against your interests, in any of these proceedings? A. I believed, when I filed my petition, and believe now, that the court acted conscientiously and honestly on all the facts that it had before it, or could get before it, touching my affairs, whether for me or against me. Q. Commencing with the original disbarment proceeding and including the opinions of this court in what are known as the Kauffman and the Danforth cases, and also upon your application for a rehearing, you now believe that the views of this court were honestly rendered, whether you think they were right or not, you think they were honestly rendered by this court? A. May I ask what you mean by the Kauffman case? Q. The decision of this court upon the appeal in the Kauffman case, as to whether this court acted conscientiously and according to what it believed was right in that case? A. Yes, I mean to say I believe now that the court acted on all the facts and circumstances it had, according to what it believed to be right. Q. Of course, in the former decision of this court, in which the opinion was written by myself, there were references made to the Kauffman case, and therefore I think it proper to ask this question as to whether now you believe that this court, whether right or wrong in its decision, acted conscientiously and from proper motives. A. My answer to the former question stands to that as 'Yes.' Q. Now in regard to these matters in which you have at times criticised the court, when did you first become satisfied that you were in error in your criticisms of the court? A. At the time that I made the criticisms of the court, I felt in my own heart and mind, and those who knew me best joined with me in

feeling it and expressing it, that I had been terribly wronged, and at that time, under the heat and the fighting back spirit, I said and did things that I wouldn't have said or done today, or tomorrow, or months ago. But as time wore on, and I began to study the situation and try to put myself in the position of the man on the other side, I saw how a man away from the scene of action, not being able to know what the presiding judge of this court wrote in his opinion, and that was that there was intense feeling and bitterness shown against me, I saw how a court or man could be honest and conscientious and write the opinions and make the findings. I knew all the time what the now presiding judge of this court wrote, and that was that there was an awful amount of incompetent testimony offered by men that knew it was incompetent, would have to know it, and that there was an intense amount of feeling against me, and as this dawned on me and this volume of testimony came up to a court removed from the scenes, I began to see, to realize, and to know that a man could be honest, his heart could be right, and yet he would hold against me, although I felt, and have seemed to feel always, that there had been a terrible injustice and wrong done to me. Q. Well, could you fix any time when you first became satisfied in your own mind that the court had acted conscientiously and with proper motives in what it may have done? A. I am unable to fix an exact day because this didn't come to me at once, as I told you, because I have always been unfortunate in being of a very strong temperament, combative spirit, and as time grew on, and I began to realize more and more, and, as I said before, put myself in the other man's position—I can't say now any certain day this took place, because it wasn't any revelation to me all at once, but it was rather a growing sense of justice that came over me, that these men could make these findings honestly and conscientiously without being bitterly, personally opposed to me or trying personally to injure me. And I want also to add to this answer that there are now, and were then, and have been for three years, circumstances and conditions existing in and among the bar of Minnehaha county, which made me, when I was suffering from

my wrongs, wonder how those things could exist and I should be made to suffer for what I thought was trying to be square. All that influenced my mind and brain, and I read in your honor's opinion, written by the present presiding justice, that rather it was the duty of myself or some one else to call these things to the attention of the court, that it was not the duty of the court to take cognizance of these things. I knew of certain men in the bar, things that were common knowledge to the public that they had done, and, suffering as I was, I felt that I was sort of being treated unfairly, and it influenced my mind in that way. But, as I say, with time and study and thought and reflection, I made up my mind that the court wasn't fighting at me particularly, and that no member of it was, and then I felt that it was my duty, whether I was reinstated or not, because it is the duty of any man who wrongs another, to make retraction and make apology, and fix it up the best he can. I want the court to understand, whether it admits me or not, that I am making this apology in good faith, and that since the last opinion I have written or said or done nothing against this court or any other court in this state. Q. I suppose, Mr. Egan, from what you have already said, that you fully realize what might be the consequences of charges against the court upon the minds of the public that were not conversant with the full situation? A. I can readily see, and regret very much what might occur. I can see, your honors, how that, if one is so situated that he has influence, that the injury might be greater in proportion. Q. At the time or times when you may have said or written anything that might reflect upon the honor and integrity of this court, or any other court, or the members thereof, did you, at that time, have a desire in your own heart that those who should hear or read what you said or wrote should believe that the courts were influenced by wrong motives? A. As I think of the situation and circumstances now, when I wrote the things that the court complains of, and may have made any statements that might be taken as derogatory to the court, I don't remember that I had any thought about the real effects at that time. I was expressing a feeling that was over me and that I had, and

did it as I have tried to explain to the court. Q. Without any purpose in mind, in view?. A. Well, of course, I had the purpose, as I would, of expressing my opinion, but without weighing the effect or the consequences. I don't think I had debated that in my mind, because, as I said, I felt that I had been terribly wronged and goaded and abused by certain people surrounding me, and certain newspapers that have since learned to speak differently of me, and I rather charge it up to that feeling than to any weighed or deliberate thought. Q. Since you have become satisfied in your own mind that this court acted with proper motive in all that it may have done, what, if any, steps have you taken to set this matter in the proper light before the people of the state? A. I cannot answer at this time, your honors, that I have taken any definite steps, only that I have come to the proper tribunal to make what amends I could, knowing, of course, as I do know, being a man of the world, that whatever I filed here would be heralded by my political enemies as it has, magnified and intensified, to the people of the state. Q. In some of the statements to which attention was called in the former decisions of this court, and possibly in some statements or articles written since, there appeared matters which might, in some way, to some extent at least, imply lack of integrity and proper purpose on the part of the circuit and county courts before whom proceedings have been had from time to time in which you were interested. From what you have said in your statement, I take it that you desire your retraction to be understood as applying to those courts also? A. I so stated, and the petition, I think, is broad enough to cover that. I said, 'Before the courts of this state.' If it does not, I am willing to make it."

The petitioner's testimony, the files of his newspaper, the former decisions of this court, and all its records disclose relevant to the issues presented by his petition, have received the thoughtful consideration of each member of the court as now constituted. All concur in these conclusions: (1) That the court would have been justified in refusing to admit the petitioner in the first instance until after the litigation relating to the O'Grady property

then pending had been concluded; (2) that the petitioner's con-
duct in connection with the O'Grady case clearly justified the de-
cision revoking his license; and (3) that the petitioner's attacks
upon the courts of this state clearly justified the denial of his
application for reinstatement. So the only question open to dis-
cussion is whether the petitioner's conduct since his application for
reinstatement was denied has been such as to justify the assump-
tion that he has become a fit person to practice law. He was mis-
taken when he testified "that since the last opinion I have written
or said or done nothing against this or any other court in this
state." An examination of the files of his newspaper in the de-
partment of history will disclose numerous libelous articles con-
cerning the courts and judges of this state, published since the
decision denying his application for reinstatement was rendered.
It will be assumed, however, that when the pending petition was
filed the petitioner acted in good faith, was prompted by proper
motives, and that he now honestly intends hereafter to maintain
the respect due to courts of justice and judicial officers. Though
now conceding that the judgment in the disbarment proceeding
was the honest expression of this court, upon the evidence before
it, he has not admitted there was any impropriety in his conduct
towards his client, Julia Ann O'Grady. Naturally, no one usually
views his own conduct as it is viewed by others. No one should
renounce an honest belief, however erroneous. The petitioner
should not be criticised for adhering to his belief if he honestly
believes he should not have been disbarred. But he should be con-
demned by all fair-minded persons for his long-continued refusal
to concede that others might honestly differ from him on that
subject. Undoubtedly the petitioner has suffered; so have those
whom he has brutally attacked in his newspaper and public ad-
dresses. Undoubtedly he has disregarded his duty as an attorney
and counselor at law; his duty as a citizen. Nevertheless, assum-
ing the good faith of his present attitude, appreciating the con-
sequences to him of continued exclusion from his chosen pro-
fession, possessing the power to correct the mistake if time shall
reveal that one has been made, and hoping the exercise of clem-

ency may broaden the petitioner's charity towards his fellow men, the court concludes, without receding in the slightest degree from either of its former decisions as to the fitness of the petitioner to practice law when such decision was rendered, that he should now be given an opportunity to demonstrate the genuineness of his reformation.

The judgment of disbarment will be so modified as to operate as a suspension expiring January 1, 1911.