HOWARD, Respondent, v. POTTS, Appellant.

(233 N. W. 909.)

(File No. 7011. Opinion filed December 30, 1930.)

*A. A. Brown,* of Mobridge, and *Sterling, Clark & Grigsby,* of Redfield, for Appellant.

*Martens & Goldsmith,* of Pierre, and *Morrison & Skaug,* of Mobridge, for Respondent.

BURCH, J. James Howard is an Indian. In 1919 the government issued to him a patent in fee covering a half section of land in Corson county, S. D. He afterwards sold this land to the Hagen Realty Company for $10,000, receiving $1,000 of the purchase price in cash and a $9,000 mortgage on the land. By some means (referred to by appellant as legerdemain), the Hagen Realty Company obtained an assignment of this mortgage and then placed two mortgages on the property, one to E. M. Grobel for $3,000 and one to the First National Bank of Mobridge for $1,211.50, and transferred the property by deed to August F. Hagen. Howard, claiming to have been cheated out of his $9,000 mortgage, employed W. M. Potts, an attorney of Mobridge, to commence and conduct necessary legal proceedings to protect his rights and obtain redress. Potts commenced an action against the Hagen Realty Company, August F. Hagen, E. M. Grobel, and the First National Bank. The Hagen Realty Company disclaimed interest. August F. Hagen answered, claiming ownership in fee, and the two mortgagees answered, claiming default, and asked for foreclosure of their

mortgages. This litigation was settled, resulting in a reconveyance of the land by Hagen, subject to all liens, and, in addition, a deed to a quarter of land subject to liens, the equity being valued in the settlement at $500. The Hagen Realty Company was insolvent. The propriety of the settlement of the litigation is not questioned, and there appears to have been no dissatisfaction with Potts' set-. tlement. Under the contract of employment, Potts was to receive as his fee 50 per cent of the recovery, so that, upon termination of the litigation, Potts and his client, Howard, became joint owners of the equities in the two tracts of land. For some time ineffectual efforts were made to sell the equities. Then Potts made a deal with Howard whereby he became the owner of Howard's share. Shortly theerafter Potts sold the land at a price which netted him a considerable profit. Howard became dissatisfied with his dealings with Potts. Howard was declared an incompetent, a guardian was appointed for him, and his guardian, Paul C. Hanson, brings this action, claiming fraud and deceit in the contract of employment, and also in the contract of sale of his equities to Potts. The trial court found in favor of Potts on the contract of employment and against him on the contract of sale. Potts appeals from the judgment and an order denying his motion for a new trial.

 There is no appeal from the finding of the court that the contract of employment was fair, so it must be accepted as a fact that Potts fairly and without fraud became a joint owner of the equities in the two tracts of land with Howard. We must therefore confine this case to the transaction whereby Potts became the owner of Howard's interest in the land. If that was legitimate and fair, Howard has no cause for complaint.

The principal question before us is the sufficiency of the evidence to support the findings of the learned trial judge. At the time Howard employed Potts he had no money. Anticipated expenses and costs of the litigation to be instituted were advanced by the Indian agent out of funds belonging to Howard's minor child. After the termination of the litigation, and when Howard and Potts had become joint owners of the property recovered in the litigation, an effort was made to sell the property. The effort was unsuccessful, and there is nothing in the evidence to indicate that the effort to sell was not in good faith, except the bare fact that Potts was able to make an advantageous sale shortly after

acquiring Howard's interest. Of this we will speak later. Conceding for the time being that the effort to sell was in good faith, and that no sale could be made more advantageous to Howard than the sale he made to Potts, then Howard was not injured by the transaction, and no unfair advantage was taken of him. We find no evidence that any one was willing to pay more than Potts did pay. In fact, there is no evidence of any market value or that the equities could be sold to any one. Potts was not obliged to buy at any price. It is obvious, however, that, if nothing was done, the equities would soon be destroyed by the mortgages then in process of foreclosure, and would be lost to both Howard and Potts. Unless the mortgages were paid or redemption made, there would soon be no equity left in favor of the fee owners. Howard having no money to protect his equity, and Potts being under no obligation to do so, and there being no market for the equities, Howard's interest was valueless, unless, pending the final foreclosure of the equity of redemption, a purchaser could be found. Whether or not a purchaser could be found was problematical. Under such circumstances, there is no indication of lack of business acumen in selling to his associate, who was willing to give him $600. If this was all that Potts would give, and no one else would give more, then that was all Howard's equity was worth for immediate sale. No matter what the future value might be, there could be no fraud, unless Howard was fraudulently induced to sacrifice his interest by an immediate sale.

We turn our attention to the conduct of Mr. Potts in the negotiations. Whether or not the relationship of attorney and client existed at the time of the sale we do not decide. We shall assume that the disposition of the property acquired as a result of the litigation is so intimately connected with the relationship of attorney and client existing during the litigation as to require on the part of the attorney the utmost good faith. We shall assume that it was his duty to give his client any information he had up to the time of the transaction in respect to the value of the property, any prospect of its sale, or any facts which might be pertinent to enable his client to act wisely. On this assumption, what are the facts? Did Potts say or do anything to influence his client improperly, or did he suppress any information that his client ought to have had? Potts says his client wanted to sell, but that he ad-

vised him to hold on. It is not hard to believe that a man without money, an Indian, would be anxious to make a sale. A shrewd business man might be anxious to sell property of this character which might shortly become wholly worthless. If Potts was paying all the property was worth, there would be no temptation to unfairly induce the sale. It might be necessary for him to buy in order to carry on and protect his own interest and get rid of a restless joint owner who could advance no money or in any way aid if redemption became necessary. There could be no wrong in buying out such an associate in order to obtain a free hand in dealing with priorities that threatened the holdings of both. Potts bound himself to the payment of $600 for Howard's share. The evidence shows that the equity in the quarter section was received on the basis of $500, and nothing shows that it was ever worth more.

As to the half section, efforts had been made to sell it at $20 an acre cash. The incumbrances actually paid by Potts against the half section as found by the court amounted to $5,682.27, which would leave an equity on the basis of $20 an acre less than $718, which, added to the supposed equity of $500 in the quarter section, would be only $1,218. Potts owned half of this, so it would look as if he had paid all the property was apparently worth, and more than any one else had ever offered to pay. Much is made of a letter written by Potts to E. D. Mossman, Indian agent, to obtain the consent of the agent to the deal in which Potts had stated the incumbrances to be $6,162.35, some $480 more than the amount found by the court. But one item to make up this excess is set out as "Estimated expenses, sale of property, $320.00." This item, of course, was not included in the court's finding as to amount of incumbrance. It is not an incumbrance, and is not stated to be in the letter to Mossman. It could not be misleading as itemized, and certainly was an item that might properly influence the agent in considering his approval. It was not improper to tell him what the cost of making a sale to a third party was likely to be. After Potts became the owner, he was able for cash to obtain some small concessions on the incumbrances. But this is no concern to Howard. We see nothing in the letter to Mossman indicative of fraud. The status of Howard in reference to the Indian office was at the time that of a competent Indian. The agent had nothing to do with approving the deal. Apparently the agent was advised as evidence

of good faith and to protect Potts from accusations of taking advantage of an ignorant Indian client. If a sort of superimposed agency resulted, there is no evidence that Mossman would have refused to approve the deal if he had been advised of the exact amount of the concession that could be obtained for cash. He would not have been justified in refusing his approval on that ground. The reductions could not be had without payment, and Howard was in no position to purchase the reductions.

The circumstance that probably is responsible for this action and gives rise to the suspicion that the deal was unfair is the fact that shortly after Potts acquired the property he was able to sell the half section at $28 an acre. If he had a deal at this price pending at the time, or a prospect of a good sale which would net Howard more than $600 without an outlay of cash impossible for Howard to meet, he should have disclosed the facts and advised and assisted his client in obtaining the added value. But there is no evidence that Potts did know. The sale was made to a stranger, and Potts claims to have been as much surprised at his luck as any one. We find no evidence of fraud, though we apply to this case the strict rule of fair dealing between attorney and client. His client had been well trimmed before he was employed. As the result of his labors, two thin equities were received, which he bought on a long chance and realized on by pure luck.

The judgment and order appealed from are reversed.

POLLEY and SHERWOOD, JJ., concur.

MISER, C., sitting in place of CAMPBELL, J., disqualified.

BROWN, P. J., dissents.

MISER, C. (concurring). The trial court found that the value on January 22, 1926, of the half section was about $6,400, and that appellant later paid charges against this land amounting to $5,682.27. This leaves an equity in the half section of $717.73. The equity in the third quarter was worth $500, making a total equity in the three quarter sections of $1,217.73. Appellant bought respondent's half interest in this equity for $600, or only about $8.87 less than its value.

This finding is not to be discounted by the fact, however relevant, that appellant, by unexpected luck, sold the half section on March 23, 1926, for $28 per acre. Furthermore, the court found

that on January 22, 1926, Potts dictated the letter to Mossman in the presence and hearing of Howard, and fully informed Howard as to its contents, before Howard signed the letter. Therefore Howard knew that Potts had stated to Mossman that he (Howard) wanted to accept the offer of $20 per acre referred to in the letter, and that Potts did not want to sell at $20 per acre. He knew that in that letter Potts said: "I feel that if I could offer reasonable terms * * * we might sell it at from $25.00 to $30.00 per acre."

The facts then are that the price agreed upon between Potts and Howard was a close approximation of the fair value of Howard's equity, and that Potts accepted Howard's offer to sell for $600 after telling him the land would sell for more.

But the court also found that Potts had, in this letter, represented to Howard and Mossman that the incumbrances against the half section amounted to $6,162.35. At $20 per acre, this would leave a total equity therein of only about $237.65, for a half interest in which Howard was offered $600. The trial court found that it was on this basis that the deal between Potts and Howard was made and the basis on which Mossman approved. In this letter Potts did state:

"Against the S½ 32-18-28 there stand approximately the following liens and encumbrances: * * *

"Total .............................$6,162.35."

Of the items listed the court makes no finding of misrepresentation as to taxes unpaid or amount required to pay off the First National Bank mortgage. As a matter of fact, it took slightly more the pay the taxes and slightly less to pay the mortgage. Among the statements found to be misrepresentations is the following:

1st Mtg. to E. M. Grobel, now in default, due June 1, 1925..$3,300.00
Int. on said sum at 10% from that date, approximately..$ 475.00

As to this the court found: "That the said defendant represented and stated to the plaintiff, James Howard, and to his advisor, E. D. Mossman, that there was due on the E. M. Grobel mortgage the sum of $3,300.00 and interest in the sum of $475.00 or a total of $3,775.00; that in truth and in fact the amount due upon said mortgage at said time amounted to approximately $3,511.75."

The facts as disclosed by the evidence are that the principal of the note secured by that mortgage was $3,000, of which, elsewhere in the letter, Mossman was advised; that its due date was June 16, 1927; that the interest coupon of $300, due June 16, 1925,

was also unpaid, causing default in the mortgage; that interest on the principal of $3,000 and on the unpaid interest coupon of $300 at 10 per cent from June 16, 1925, to January 22, 1926, had accrued; that in his answer Grobel had set up a counterclaim asking foreclosure of his mortgage and for attorney's fees in the sum of $300 and for other costs; and that Potts obtained his figures from this answer. Therefore neither the statement made by Potts nor the finding made by the trial court stated the exact and complete facts. Whether the complete and exact facts reveal a situation more hazardous or less hazardous to Howard is a matter about which opinions might well differ. Grobel was actually asking judgment for more than $3,775, but $300 of this was for attorney's fees on foreclosure. Potts does not state in the letter that Grobel and the First National Bank were asking foreclosure of those mortgages and for costs, including attorney's fees. He does not state that Donaldson, a real estate agent, whose commission was to be $1 per acre, had tried for several months to sell the land for Hagen and continued to try to sell for Potts and Howard, but had been able to find only one buyer at $20 per acre, nor that the buyer so found had less than two-fifths of the cash necessary to pay the two mortgages and taxes against the land. Assuming that it would not have been apparent to Howard that the interest on $3,300 at 10 per cent for less than eight months was not $475, it is pertinent to inquire, Would Howard have declined to sell or Mossman refused to approve the sale had all the facts been fully and accurately stated? By affidavit on motion for new trial it appears that Mossman would have approved the sale. By his own testimony on the trial, it appears probable that Howard would have accepted the offer had he known every material fact. The evidence is uncontradicted that, after Potts bought Howard's interest, Potts was willing to sell the land for $21 per acre and pay a commission, and, after he himself had sold it without any assistance, he paid the agent $100 for his former efforts. Well might Howard have done just what he did do on January 22, 1926—accept $600. Had Potts not sold the land at about $8 per acre more than it was worth, it is unlikely that Howard would have been seeking, under a claim of misrepresentation or concealment of material facts, to be reinvested with a half interest in that heavily incumbered property.

In re Ramsey, 24 S. D. 266, 123 N. W. 726, 728, this court said:

"That the purchaser was the accused himself * * * was a material fact, the intentional concealment of which constituted a fraud upon the owner of the judgment. The moral maxim 'No man can serve two masters,' is peculiarly applicable to the relation of attorney and client. The relation is one of the highest trust and confidence, requiring the attorney to observe the utmost good faith toward his client, and not to allow his private interests to conflict with those of his client. In re Egan, 22 S. D. 355, 117 N. W. 874. 'In all matters connected with his trust a trustee is bound to act in the highest good faith toward his beneficiary, and may not obtain any advantage therein over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind.' Rev. Civ. Code, § 1617."

Section 1617, Rev. Civ. Code, is identical with section 1195, Rev. Code 1919. Consequently, the foregoing states the rule applicable to the case at bar. In the Ramsey opinion it was repeatedly stated that the accused intentionally deceived his client. On the other hand, in the case at bar, the letter itself, of the contents of which Howard was fully informed, indicates, not intentional misrepresentation nor fraud, but the reverse. A lawyer intending to defraud an Indian client would scarcely write a letter like that to become a part of the files of the Indian Department. Perhaps no considerable class of client in South Dakota has greater need of honest counsel than fee patent Indians. . The offices of lawyers who are willing to report their transactions over their own signatures as Potts did should not be closed to that class of clients by a holding that it is prima facie fraudulent to fail to recite a transaction with all the scrupulous exactness and completeness of a hypothetical question propounded to a technical expert on the witness stand. The gist of this matter is, Did Potts take advantage or intentionally misrepresent? As I read the evidence, he did not. That, however, is matter for the trial court to decide. The utmost that was found in the case at bar was that the letter contained inaccuracies, did not contain all the facts, and that Howard contracted on the basis of the statements in the letter. The price agreed upon by respondent was a fair price for his equity. There is not within the trial court's decision a finding of breach of faith, of intentional taking advantage, or of intentional misrepresentation or concealment. In the absence of such a finding, respondent is not entitled to judgment. I concur in the reversal of the judgment.