---

## In re EGAN.

Accused was admitted to the bar by the Supreme Court over objections, and granted a conditional license providing that the order of admission should not preclude disbarment proceedings, if it were found in a suit then pending that certain transfers of property to accused were procured by fraud. Thereafter the circuit court found the transfers fraudulent, and ordered them canceled. Held, that though the time for appealing from the judgment had not expired, having been entered by a court of competent jurisdiction, it will be regarded as fulfilling the conditions of the license so as to permit the institution of disbarment proceedings, and objections that the Supreme Court has adjudicated the question of accused's conduct by admitting him to practice are untenable.

In disbarment proceedings for fraudulently procuring conveyances from a client, evidence held to show that accused's grantor was mentally incapable of understanding what she was doing when she transferred the property.

In disbarment proceedings for fraudulently procuring conveyances of a client's property, accused's conduct held to show that he took the

property for his own benefit, and not as security for her bondsmen on a criminal charge against her.

. Where an attorney procured conveyances from a mentally incompetent client of practically all her property, leaving her comparatively penniless, it is ground for disbarment.

The relation of attorney and client is one of the highest trust and confidence, requiring him to observe the utmost good faith toward his client, and not to allow his private interests to conflict with those of his client.

The court's control over an attorney as an officer of the court is inherent, and does not depend upon statutory authority, and the specification of certain grounds of disbarment by the statute does not prevent disbarment for other grounds.

(Opinion filed, October 10, 1908.)

In the matter of disbarment proceedings against George W. Egan. Judgment of disbarment.

*Park Davis, Henry Robertson,* and *Alfred B. Kittredge,* for the prosecution. *Loring E. Gaffy, Wilber S. Glass, D. J. Conway,* and *S. H. Cochran,* for the accused.

CORSON, J. This is an original proceeding instituted in this court by a committee of the bar of Minnehaha county to disbar George W. Egan, an attorney of this court.

On the 15th day of November, 1907, the accused was admitted to practice as an attorney of this court, and the usual license issued to him. At the time the application was made for his admission, objections were filed thereto on the part of the bar of Minnehaha county; but, in view of the fact that proceedings were pending in the county court of that county for the appointment of a guardian for the person and estate of Julia Ann O'Grady, and also an action was about to be commenced by the guardian of Julia Ann O'Grady in the circuit court of that county to cancel and annull certain conveyances alleged to have been made by her to the accused, and in order not to embarrass the courts before named in their decisions, this court declined at that time to enter upon a full examination of the objections filed on the part of the members of the bar, and therefore granted a license conditional, which is as follows: "It is ordered that George W. Egan, upon taking and filing the required oath, be admitted and licensed to practice as an attorney and counselor at law in all the courts of this state, pro-

vided, however, that this order shall not preclude disbarment proceedings, based upon the conduct of said George W. Egan concerning the transfers of certain property to him by one Julia Ann O'Grady mentioned in the objections to his admission, if it shall hereafter be finally determined by a court of competent jurisdiction that such transfers should be canceled on the ground of fraudulent procurement." Subsequently to the making of said order the circuit court of Minnehaha county, Judge Frank B. Smith presiding in place of and at the request of the Honorable Joseph W. Jones, circuit judge of that circuit, has made and filed its decision in which it finds, in effect, that said transfers were fraudulently obtained, and entered a judgment directing the cancellation of the same, and the recovery by the guardian of the said Julia Ann O'Grady of $1,050 received on account of a United States bond held by the said Julia Ann O'Grady and transferred to the said accused by her as a part of the fraudulent transaction so found by the court. Although the time for appealing from this judgment has not expired, and such judgment cannot be regarded as res adjudicata by this court, it was entered by a court of competent jurisdiction, and will be regarded as fulfilling the conditions prescribed by the order admitting the accused to practice as an attorney of this court. The objection therefore made by counsel for the accused to this proceeding on the ground that this court has duly adjudicated the questions involved herein are not tenable, and are therefore overruled.

Upon this application to this court in this original proceeding, this court appointed a commissioner to take the testimony in the case, and report the same to this court on the first day of the present month. That duty has been performed by the commissioner, and the case is now before us for final determination. The prosecutors, after setting out the findings and the judgment of the court in the action before referred to, tried before the Honorable Frank B. Smith, as judge sitting for, and at the request of the Honorable Joseph W. Jones, judge of the circuit court of Minnehaha county, proceed to allege: "The said accusers, irrespective of the findings, conclusions, and judgment hereinbefore referred to, and in addition thereto, charge the said George W. Egan, with

misconduct unbecoming an attorney and counselor of this court concerning the transfer of the property specifically mentioned and described in the complaint and in the findings, conclusions, and judgment in said action, as well as in the order admitting said George W. Egan to practice in all the courts of this state, and specifically that on the 9th day of October, 1907, and for some time prior thereto, the said Julia Ann O'Grady was mentally incompetent to manage, control, or 'dispose of her property or to transact any business in relation thereto, and that on said date, while so mentally incompetent, the said George W. Egan, well knowing her mental condition as aforesaid, and taking advantage of the same for his own purposes and benefit, did wrongfully and fraudulently influence and procure her to, and she did, without any consideration therefor, transfer to said George W. Egan all of her property hereinbefore referred to.   Said accusers further charge distinct and separate from the charges hereinbefore made against said George W. Egan that, in violation of his duty as an attorney and counsellor at law both to the courts and to the said Julia Ann O'Grady, said George W. Egan did, after the said Julia Ann O'Grady had been judicially declared to be incompetent to manage her own affairs as hereinbefore stated, and after his admission to practice by this court, keep and retain and refuse to deliver the property belonging to the said Julia Ann O'Grady procured by him as hereinbefore stated to W. L. Baker, her guardian, upon demand duly made by him of said George W. Egan for said property. Wherefore, said accusers ask this court to issue proper process for the said George W. Egan to show cause why his license to practice as an attorney and counselor in all the courts of this state should not be revoked and his name stricken from the roll, or for such other order as to the court may seem just in the premises," which complaint is duly verified.   The evidence is very voluminous, covering several hundred typewritten pages, and we shall not attempt in this opinion to do more than give a synopsis of the same.

It is disclosed by the undisputed evidence that on and for a long time prior to the 29th day of September, 1907, John O'Grady and his wife, Julia, resided on a farm which was their homestead, in Mapleton township, between six and seven miles north of the

city of Sioux Falls, in Minnehaha county; that they had no children; that on the evening of September 29, 1907, said John O'Grady was killed by a shot fired from a shotgun; that the coroner and sheriff of said county, being notified of the tragedy, immediately went to the O'Grady home, where they made a hasty examination of the body of John O'Grady and the surroundings; that the coroner took the body to his undertaking rooms in the city of Sioux Falls; that, suspicions resting upon Mrs. O'Grady, the sheriff took her to Sioux Falls, and held her in custody in jail; that a coroner's inquest was held on Tuesday or Wednesday; that the state's attorney filed an information charging Mrs. O'Grady with the murder of her husband; that a preliminary hearing was held before a justice of the peace on Wdenesday or Thursday of that week, and that the justice upon the hearing ordered her committed to jail without bail; that on Monday, September 30th, Mrs. O'Grady sent for Mr. Winsor, an attorney of Sioux Falls, who was retained by her; that Mr. Winsor appeared for her at the coroner's inquest, and also at the preliminary examination; that afterwards he made a motion before the Honorable Joseph W. Jones, circuit judge, to have her admitted to bail, which motion was heard on Monday, October 7th, and the motion was granted and the bail fixed at $7,-500; that Mr. Winsor procured bondsmen for her, and she was released from custody on the evening of that day; that, as she left the jail, about one block from the courthouse, she was met by one Nick Roster and one Mumby; that a talk was there had about employing Mr. Egan, the accused, as her attorney; that it was then arranged with Mr. Mumby that he should see her after supper at the house of one Minzlaff; that after supper Mumby went to Minzlaff's house, but failed to find her, and continued his search for her without success; that the next morning he pursued his search for her, and in the evening found her near the town of Egan; that she did not return with him, but promised to return on the following morning train, which she did, arriving at Sioux Falls about 7 o'clock on October 9th; that Mumby and Roster met her at the train, and she was taken to the office of Dr. Egan, where she met the accused; that during the morning, while she was in the office of Dr. Egan, a deed of the farm formerly occupied by herself and

husband, and a bill of sale of her personal property, was signed by
Mrs. O'Grady, and immediately placed on file in the office of the
register of deeds; also, a contract was signed by Mrs. O'Grady
agreeing to pay Mr. Egan $10,000 for his services; that, in ad-
dition to the conveyances of her real and personal property, the
accused procured an order from her for a tin box in the charge of
the sheriff, in which was a government bond for $1,000, which bond
was subseuently sold by the accused and the money received by him
therefor; that the bondsmen procured by Mr. Winsor, learning of
the transfer by Mrs. O'Grady of all her property to the accused,
surrendered her up to the sheriff; that subsequently other bonds-
men were procured, and she was again released; that a short time
subsequently proceedings were instituted before the county court
of Minnehaha county for the appointment of a guardian for Mrs.
O'Grady upon the petition of a committee appointed by the Min-
nehaha county bar association; that on the 7th of November, 1907,
the county court adjudged her mentally incompetent to manage her
property, and appointed one W. L. Baker as her guardian, who
thereupon immediately qualified as such guardian; that an appeal
was taken from this appointment and judgment to the circuit court
of Minnehaha county, where a trial was had, and the judgment of
the county court was affirmed, and the case remanded to the latter
court for further proceedings; that soon after the decision of the
circuit court affirming the decision of the county court appointing
a guardian for Mrs. O'Grady the state's attorney of Minnehaha
county entered a nolle prosequi in the case of the state against Mrs.
O'Grady, and her bondsmen were exonerated; · that in the early
part of March, 1908, Mrs. O'Grady went to Oklahoma, where her
parents and brothers and sisters reside, that, arriving there, she at
once manifested symptoms of insanity, and on the 11th day of
April, after an examination before the commissioners of insanity,
she was adjudged insane, and committed to the State Hospital of
Oklahoma, where she still remains; that in both of the above hear-
ings before the county court and the circuit court the accused ap-
peared for Mrs. O'Grady in resisting the charge of insanity; that
soon after his qualification as guardian on November 8th, the said
Baker demanded in writing of the accused all property and money

that had been conveyed and delivered to him by Mrs. O'Grady, which demand he refused; that thereupon, about Novembes 19th, an action was commenced by the said guardian against the accused for the cancellation of the said deed and bill of sale, and the recovery of all said property, resulting in a judgment in favor of the said guardian, canceling and setting aside the said conveyances, and that he recover judgment against the accused for the sum of $1,-050.

It further appears from the evidence that Mrs. O'Grady had the sum of about $50 which she turned over to the accused in connection with her other property on the forenoon of October 9th, and that she was left with a small sum in change, and, with that exception, she had transferred to the accused all of her property, real and personal, including the bond above mentioned and a $2,400 note and mortgage and the $50 in money, and that she left the office of Dr. Egan after making those transfers without any means for her support or maintenance. It further appears from the evidence that during the time she was in the office of Dr. Egan, and was making these transfers of her property to the accused, Dr. Egan, Mr. Mumby, and Roster were present, but she had no friends or acquaintances with her, and there alone with the accused and the three parties before named she apparently signed any paper that was presented to her by the accused for her signature. It is further disclosed by the evidence that for some time prior to the death of her husband she had shown evident signs of insanity; that, after she was taken to the jail, she seemed possessed with the delusion that she was to be hanged immediately in the presence of the people, and that she said to Mr. Winsor, Mrs. Winsor, Mr. O'Reiley, the deputy jailor and the sheriff, repeatedly that she knew she was to be hung on the same gallows that had been used some years previously for hanging a person that she named, and that she had seen the workmen preparing the scaffold for her execution. While in jail she complained of being ill, and, the county physician being called to attend to her, she refused to take his medicine, stating that she knew that it was poison; that she refused to eat anything prepared at the jail for the reason that they were intending to poison her. It further appears that, when she

was released from the jail and taken to the home of Mrs. Horton, her conduct was such that the Horton family were fearful of their own lives and those of their children, and that they requested the sheriff to remove her to some other place. While there was some evidence on the part of the accused tending to prove that she was mentally competent to transact business, we are clearly of the opinion that she was of unsound mind and mentally incapable of understanding what she was doing at the time she transferred her property to the accused.

It is claimed by the accused that at the time she transferred all of her property to him that he made out a written memorandum agreeing to account to her for the property received, but, in view of the fact that he had her contract agreeing to pay him a fee of $10,000, the accounting would have been of little benefit to her, as the property transferred by Mrs. O'Grady did not exceed in value $6,000, and she would have therefore been left indebted to him in the sum of $4,000 on account of his fee, less some reductions he claims he agreed to make in case the criminal proceedings against her should be terminated in the circuit court. It will be noticed that the conduct of the accused after being retained by Mrs. O'Grady to defend her on the charge of the murder of her husband, in advising her to resist the application for the appointment of a guardian for her and acting as her counsel in the probate court in resisting the application on the ground that she was mentally incompetent to attend to her business, and again appearing in the circuit court in further resistance of the application for the appointment of a guardian for her, was an extraordinary proceeding, as the establishment of her mental incapacity would have aided him very greatly in her defense upon the grave charge against her. In thus defending her and in appearing for her in opposing these proceedings, he was acting directly against the interest of his client, and could have had no other object in view than that of maintaining the legality of the transfers of her property to him made by her.

It is claimed by the accused that the conveyances of the property were taken in the nature of security to her bondsmen, but this claim cannot be considered a valid one, as, if that was the object

of the conveyances, they should have been in the form of a mortgage to the bondsmen or in the form of a trust deed. His subsequent conduct, therefore, in refusing to turn over the property, quite clearly shows that he took the property from her for his own benefit, notwithstanding the memorandum in pencil which he claims to have executed agreeing to indemnify the bondsmen and the memorandum in pencil agreeing to account to Mrs. O'Grady for the proceeds of the property. The conduct of the accused in securing from Mrs. O'Grady her entire property, and leaving her comparatively penniless, was such misconduct on his part as to render him an unsuitable person to remain as an officer of this court, and to be further permitted to perform the duties of an attorney.

The relation existing between an attorney and his client is one of great confidence, and gives the attorney great influence over his client. The relation he bears to his client implies the highest trust and confidence. He is an officer of this court, and in the performance of his duties as such an attorney he is required to observe towards his client the utmost good faith, and to allow no private interests of his own to conflict with the interests of his client. An attorney also owes a duty to his profession and to the court from which he has received his license, as well as to his client. As an officer of the court, the latter may exercise its jurisdiction over him to the extent of depriving him of his office, and striking his name from the roll. Such a power is indispensable to protect the courts, the dignity and purity of the profession, and for the public good and the protection of clients. While our Code has provided certain causes for the revocation or suspension of an attorney, the power to cancel a license issued is an inherent power in the court, and, as stated by Mr. Weeks in his work on Attorneys: "No statute or rule is necessary to authorize the punishment in proper cases. Statutes and rules may regulate the power, but they do not create it. * * * And, where certain grounds are specified by the statute, this does not necessarily exclude striking from the rolls for causes not specified. A statute is not to be construed as restrictive of the general powers of the court over its officers." Weeks on Attorneys at Law, § 80; 4 Cyc. 905, 906; In re Smith, 73 Kan.

743, 85 Pac. 584; State v. Mosher, 128 Iowa 82, 103 N. W. 105; Boston Bar Ass'n v. Greenhood, 168 Mass. 169, 46 N. E. 568; State v. Harber, 129 Mo. 271, 31 S. W. 889; In re Simpson, 9 N. D. 379, 83 N. W. 541-553.

The conduct of the accused in this case, not only shows his unfitness to be a member of this court, but shows that his perceptions of the duties and responsibilities of an attorney are such as to render him an undesirable associate of the members of a highly honorable profession, and dangerous for clients who may seek his assistance as an attorney. While we cannot overlook the fact that striking the name of the accused from the roll and revoking his license may result in serious consequences to himself and family, we cannot be unmindful of the duty we owe to ourselves, the courts of the state, the members of the bar, and the community in general. Such conduct as has been shown in this case reflects, not only upon the attorney himself, but seriously reflects upon the court and the members of the bar. All of the considerations that could be advanced in favor of the accused were ably presented by eminent counsel, but we have failed to discover any extenuating circumstances attending this remarkable transaction. To permit the accused to longer remain an officer of the court and entitled to the privileges accorded to an attorney would be to lower the standard of professional conduct, and encourage the younger members of the bar to pursue a course that cannot be recognized by this court. It has been the aim of this court to elevate the character both morally and intellectually of the members of the bar and to retain the accused longer as a member of the bar would be doing an injustice to ourselves, to the profession, and to the community. Unpleasant, therefore, as is the duty, we must perform it, and strike from the roll of this court the name of the accused, and cancel the license heretofore issued to him.

FULLER, J., taking no part in this decision.