In the Matter of the Discipline of KUNKLE

(218 N.W.2d 521)

(File No. 11243. Opinion filed May 29, 1974)

**Christopherson, Bailin & Anderson, Marvin K. Bailin,** Sioux Falls, for George W. Kunkle.

**Kermit A. Sande,** Atty. Gen., Pierre, for the State.

WOLLMAN, Justice.

This is a disciplinary action brought against George W. Kunkle (respondent), an attorney at law practicing in Yankton, South Dakota.

On December 12, 1972, the chairman of the grievance committee of the State Bar of South Dakota submitted a report that had been prepared for the committee by its investigator regarding the alleged misconduct of respondent, along with the committee's report and unanimous recommendation that disbarment proceedings be initiated against respondent. Based upon the committee's report and recommendation, this court entered an order on December 20, 1972, directing the Attorney General of South Dakota to prepare and file a formal complaint against respondent with reference to the alleged misconduct set forth in the committee's report and with reference to any other unprofessional conduct of which the Attorney General might be advised. On January 18, 1973, the Attorney General filed a complaint against respondent charging him with misconduct in handling four separate legal matters, which will be referred to as the Navratil case, the Andrew Oja guardianship, the Walter Oja guardianship, and the Owens estate.

On March 8, 1973, this court entered an order appointing the Hon. Jon Fosheim, one of the judges of the Ninth Judicial Circuit of the State of South Dakota, as referee to take and hear the evidence in the disciplinary proceeding and to make and file with this court his findings of fact and recommendations thereon.

Hearings were held on April 18, May 29 and June 14, 1973, and the referee filed his findings of fact and recommendations of referee with this court on August 15, 1973. Respondent filed objections to the referee's findings. A hearing on said findings was held before this court on September 19, 1973. On September 24, 1973, the court ordered the case remanded to the referee with instructions to make and file a supplemental report containing specific findings of fact with reference to the William J. Owens estate charge. The referee filed a supplemental report and specific findings of fact on October 1, 1973, to which respondent filed written objections. Counsel for the respective parties waived further oral argument before the court on the supplemental findings on December 7, 1973.

■ The referee found that the charges concerning the Navratil case and the two Oja guardianship cases had not been established by a clear and undoubted preponderance of the evidence. Although this court is not bound by the findings of a referee in disciplinary proceedings, In Re Morrison, 43 S.D. 185, 178 N.W. 732, our review of the record leads us to concur with the referee's findings and recommendations with respect to these three charges and we have not considered these charges in connection with the findings and recommendations of the referee with respect to the charge based upon respondent's handling of the Owens estate.

With respect to this latter charge, the referee found that respondent had unduly prolonged the closing of the estate, had resorted to frivolous appeals to this court and had refused to comply with certain orders of the county court directing the return of executrix's and attorney's fees, all for the purpose of maximizing his attorney's fee and the fee of the executrix for handling the estate. Based upon this misconduct, the referee recommended that respondent be disbarred.

Before reaching the merits of the referee's findings, we must consider respondent's three-pronged attack on the proceedings against him.

First, respondent contends that the complaint filed by the Attorney General did not specifically inform respondent which

statutes or rules governing professional conduct he had allegedly violated and that therefore respondent was denied the procedural due process required by the case of In Re Ruffalo, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117.

Paragraph V of the complaint in substance charged that one William J. Owens died on November 26, 1965, that his will was filed for probate on November 30, 1965, that the will was admitted to probate and that letters testamentary were issued to Amelia Kunkle on December 21, 1965, that the probate of the estate should have been accomplished by competent counsel in a relatively short time, that the probate was not closed by respondent until April 14, 1972, and that respondent's alleged misconduct in handling the estate caused two members of the Bar to report the matter to the grievance committee of the State Bar. The complaint further stated that the probate file would be offered in evidence at the hearing before the referee.

In the case of In Re Ruffalo, supra, petitioner's attorney was originally charged with 12 counts of misconduct. Two of the counts accused petitioner of soliciting Federal Employers' Liability Act plaintiffs as clients through an agent. At the disciplinary hearing, both petitioner and the alleged agent testified that the agent did not solicit clients for petitioner but merely investigated FELA cases for him. Upon hearing this testimony, the Ohio Board of Commissioners on Grievances and Discipline added, on the third day of the hearing, charge No. 13, which charged petitioner with conspiring with and paying the alleged agent for preparing lawsuits against petitioner's employer. Petitioner's motion to strike this new charge was denied, but he was given a continuance in order to have time to respond to the new charge. Petitioner was found guilty of seven counts of misconduct, including No. 13. The Supreme Court of Ohio held that the evidence was sufficient to sustain only two charges against petitioner, one of them being No. 13, and ordered petitioner disbarred. In subsequent proceedings based upon the state court disbarment of petitioner, the Court of Appeals for the Sixth Circuit held that the allegations in charge No. 13 justified discipline and on the basis of said charge it disbarred petitioner from practice in that court.

In holding that petitioner had been denied procedural due process, the United States Supreme Court stated that:

"In the present case petitioner had no notice that his employment of Orlando would be considered a disbarment offense until *after* both he and Orlando had testified at length on all the material facts pertaining to this phase of the case. * * *

"These are adversary proceedings of a quasi-criminal nature. Cf. In re Gault, 387 U.S. 1, 33, 87 S.Ct. 1428, 1446, 18 L.Ed.2d 527. The charge must be known before the proceedings commence. They become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused. He can then be given no opportunity to expunge the earlier statements and start afresh." (Footnote omitted) 390 U.S. 544, 550, 88 S.Ct. 1222, 1226, 20 L.Ed.2d 117, 122.

In answer to the argument that there had been no due process violation because petitioner had been given several months to respond to charge No. 13, the Court stated that serious prejudice to petitioner may well have occurred because he may well have been lulled into a false sense of security that he could rebut the original charges by proving that his alleged agent was his investigator rather than a solicitor of clients and that in that posture he would have had no reason to suspect that by rebutting the original charges he would be, by his own testimony, assuring his disbarment under charges not yet made. 390 U.S. 544, 551, 88 S.Ct. 1222, 1226, 20 L.Ed.2d 117, 122, n. 4.

■ Although the complaint in the instant case could very well have been made more specific with regard to respondent's alleged misconduct, we hold that it adequately informed respondent of the nature of the charge against him based upon his handling of the Owens estate, regardless whether the proceedings against petitioner are considered to be of a civil nature, In Re Morrison, supra, or quasi-criminal in nature, In Re Ruffalo, supra. Even in criminal cases the charge is sufficient if it enables a person of common understanding to know what is intended from the language contained therein and if it apprises a

defendant with reasonable certainty of the accusation against him so that he may prepare his defense. See, e. g., State v. Sinnott, 72 S.D. 100, 30 N.W.2d 455; State v. Belt, 79 S.D. 324, 111 N.W.2d 588.

Moreover, prior to the hearing before the referee this court granted respondent permission to examine and copy the court file compiled in the probate of the Owens estate and also permitted respondent's attorneys to examine, but not copy, any written report of the grievance committee together with any statements, letters and other papers connected with said report which were in the office of the clerk of this court. Respondent's attorney acknowledged at the initial hearing before the referee that he had examined and copied the court file in the Owens estate and that he had examined the grievance committee's report and the record compiled therewith. This report, dated December 12, 1972, summarized the lengthy, detailed report of the investigator, and stated that it was the unanimous opinion of the committee that respondent had acted improperly in that he (1) had needlessly prolonged the probate of what appeared to be a simple estate for his own ends and profit, (2) had wilfully disobeyed and had had his wife disobey various orders of the court issued in regard to the probate, and (3) had blatantly attempted to extort an unjustified amount of fees for himself and for his wife from the estate.

No man of reasonable intelligence and possessing common understanding could read the report of the investigator and the report of the grievance committee without being perfectly well aware of the nature and substance of the charges against respondent. When viewed in the light of the knowledge that respondent and his attorneys gleaned from studying the probate file and from examining the report of the grievance committee and the various papers filed in connection therewith, we cannot say that respondent was misled or in any way prejudiced by the lack of specificity in the complaint. Certainly respondent was not misled or prejudiced in his defense to the charges in the manner in which the petitioner may have been misled and prejudiced in the Ruffalo case, supra, inasmuch as respondent did not testify or in any other manner take a position that was later used as the basis of another charge against him. In his amended answer respondent admitted that the probate in the Owens estate was

begun and closed substantially as alleged in the complaint and that the probate was carried forward in conformity with law and in conformity to those disciplinary rules governing professional conduct. This did not constitute a damaging admission in view of the fact that there could be no argument with the record evidence concerning the opening and closing dates of the estate proceedings, nor did it form the basis of any subsequent or amended charge against respondent.

In summary, then, although the complaint could well have been made more specific with respect to the charge based upon respondent's handling of the Owens estate, it was not so vague as to mislead respondent or to prevent him from preparing an adequate defense to the charge.

Respondent's second ground of attack upon the proceedings against him is based upon the argument that the statutory procedure employed in South Dakota for the discipline of attorneys is unconstitutional on its face because it violates an accused attorney's right to due process of law as guaranteed to him by the Fourteenth Amendment to the Constitution of the United States and by Art. VI, § 2 of the Constitution of the State of South Dakota, and also violates an accused attorney's right to refrain from self-incrimination as guaranteed to him by the Fifth and Fourteenth Amendments to the Constitution of the United States and by Art. VI § 9 of the Constitution of the State of South Dakota.

The procedure governing the discipline of attorneys in this state is set out in SDCL 16-19. SDCL 16-19-1 provides that this court shall have sole power to revoke an attorney's license or to suspend him from the practice of law. SDCL 16-19-5 provides that:

"The proceeding to disbar or suspend an attorney may be initiated:

(1) By the direction of the Supreme Court;

(2) By the attorney general;

(3) By the grievance committee of the state bar; or

(4) By an individual."

If the proceeding for disbarment or suspension is initiated by the court, the matter may be referred by the court either to the Attorney General or to the grievance committee of the State Bar for investigation and report or the court may direct either the Attorney General or the grievance committee to prepare and file a formal accusation. SDCL 16-19-6.

If the Attorney General initiates the proceeding, the court may direct the Attorney General to prepare and file a formal accusation or may refer the matter to the Attorney General or to the grievance committee for further investigation and report. SDCL 16-19-7.

If the grievance committee initiates the proceeding, the court may direct either the grievance committee or the Attorney General to prepare and file a formal accusation or the court may refer the matter to either the Attorney General or the grievance committee for further investigation and report. SDCL 16-19-8.

If an individual initiates the proceeding, the court may direct either the Attorney General or the grievance committee to prepare and file a formal accusation or it may refer the matter to the Attorney General or the grievance committee for further investigation and report. SDCL 16-19-9.

SDCL 16-19-13 authorizes the Attorney General and the chairman or any member of the grievance committee to issue subpoenas requiring any witness to attend and to give testimony with reference to any matter pertinent to accusations which have been referred for investigation.

SDCL 16-19-15 provides that:

"If upon the initiation of any such proceeding, or after an investigation and report as provided in §§ 16-19-12 to 16-19-14, inclusive, the Supreme Court shall determine that a formal accusation shall be filed it shall direct either the attorney general or the grievance committee of the state bar to draw up a formal complaint or

accusation and serve the same upon the accused in such manner as the court may direct, and in all cases the further conduct of the proceeding on behalf of the court and the accuser, if there be one, shall be in charge of either the attorney general or the grievance committee of the state bar whichever may have been directed by the court to prepare and file said formal accusation."

SDCL 16-19-16 provides that:

"To such accusation the accused may plead or demur and the issues joined thereon shall in all cases be tried by the Supreme Court, but the court may refer said matter for the taking of testimony and the making of findings and recommendations. Such reference may be to any circuit court judge in this state or to a referee or referees appointed by the court in the same manner as provided by law for the reference of cases in the circuit court so far as applicable.

"If the accused plead guilty, or fail to answer, the court shall proceed to render such judgment as the case requires."

■ Respondent has no standing to complain as to any alleged constitutional defects in SDCL 16-19-13. No subpoena was served upon him nor does the record reveal that any request was made that he testify in any investigatory hearing or in the hearing before the referee. Moreover, we do not believe that Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574, and In Re Ruffalo, supra, require us to hold that disciplinary proceedings are of a criminal nature within the meaning of the constitutional privilege, both state and federal, against self-incrimination. See, e. g., Black v. State Bar of California, 7 Cal.3d 676, 103 Cal.Rptr. 288, 499 P.2d 968, and authorities cited therein; In re Schwarz, 51 Ill.2d 334, 282 N.E.2d 689; Kelly v. Greason, 23 N.Y.2d 368, 296 N.Y.S.2d 937, 244 N.E.2d 456; Committee on Legal Ethics of the West Va. State Bar v. Graziani, W.Va., 200 S.E.2d 353. See generally, Note, "Self-Incrimination: Privilege, Immunity, and Comment in Bar Disciplinary Proceedings," 72 Mich.Law Review 84 (1973).

The main thrust of respondent's attack upon the constitutionality of SDCL 16-19 is based upon the claim that the procedure set forth therein places this court in the untenable position of being the investigator, the grand jury or indictor, the prosecutor and the final arbiter and judge in disciplinary actions. This, argues respondent, violates an accused attorney's constitutionally guaranteed due process right of a fair hearing before a fair tribunal. In support of this contention the respondent cites Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749; In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942; In Re Ruffalo, supra; and Ward v. Village of Monroeville, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267.

Respondent argues that both in situations where this court initiates the proceeding for disbarment or suspension and refers the matter for investigation and report or directs the attorney general or the grievance committee to prepare and file a formal accusation, and in those situations where the proceedings are initiated by the attorney general, the grievance committee or by an individual and the court refers the matter for further investigation and report or else directs the attorney general or grievance committee to prepare and file a formal accusation, the court is a direct participant in the investigation of any charges made and is required to pass upon the results of the initial investigation before directing that further investigation be done or that a formal accusation be prepared and filed. This, argues respondent, is tantamount to the procedure held to be unconstitutional in the case of In re Murchison, supra.

We do not agree with respondent's contention. What was at issue in the Murchison case was whether a judge who had acted as a "one-man grand jury" under Michigan law could later in open court constitutionally conduct contempt proceedings against a witness and punish him for contempt for conduct that took place before the judge in the secret grand jury proceedings. The Court held that such contempt proceedings could not pass constitutional muster because the judge, having been a part of the accusatory process, could not be wholly disinterested in the conviction or acquittal of those accused. As the Court observed:

"As a practical matter it is difficult if not impossible for a judge to free himself from the influence of what took place in his 'grand-jury' secret session. His recollection of that is likely to weigh far more heavily with him than any testimony given in the open hearings." 349 U.S. 133, 138, 75 S.Ct. 623, 626, 99 L.Ed. 942, 947.

We think the procedure condemned in the Murchison case is a far cry from our statutory procedures for conducting disciplinary actions. Granted that disciplinary proceedings have been termed quasi-criminal in nature, In Re Ruffalo, supra, they are sui generis in the sense that this court's authority to conduct them stems from the inherent power of the court to regulate the practice of law. In re Egan, 22 S.D. 355, 117 N.W. 874. See also Theard v. United States, 354 U.S. 278, 77 S.Ct. 1274, 1 L.Ed.2d 1342; Erdmann v. Stevens, 2 Cir., 458 F.2d 1205; Sharood v. Hatfield, 296 Minn. 416, 210 N.W.2d 275; In re Hallinan, 43 Cal.2d 243, 272 P.2d 768. Although this inherent power must of course be exercised in a manner that comports with due process, we must recognize the fact that the courts occupy a traditionally unique position vis-a-vis the members of the legal profession. This court has the responsibility of protecting the public from the unfit, the incompetent and the dishonest attorney, and the duty to maintain the high ethical standard of the legal profession. See, e. g., In re Egan, supra; In Re Kaas, 39 S.D. 4, 162 N.W. 370; In Re Hosford, 62 S.D. 374, 252 N.W. 843; In Re Goodrich, 78 S.D. 8, 98 N.W.2d 125. This court has no interest other than to accomplish that purpose. We have no financial interest in the outcome of any disciplinary action. Cf. Tumey v. Ohio, supra; Village of Monroeville, supra; Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488. This court has no interest in any given disciplinary action other than to see that all legitimate complaints are adequately investigated and that proper proceedings are brought if in the court's opinion the results of the investigation are such as to warrant the filing of a formal complaint. We consider our authority to review and weigh the results of a preliminary investigation to be as much a shield of protection for the attorney who may be accused by those having improper, vindictive motives as it is an aid to the court to carry out its solemn obligation to protect the public from those few

members of the bar who by their conduct have demonstrated that they are not fit to be members of the profession. In short, we consider the authorities cited by respondent to be inapposite and we hold that the procedure set forth in SDCL 16-19 does not unconstitutionally deprive an accused attorney of his right to due process of law.*

We note that our statutory procedure is somewhat similar to that governing disciplinary procedures in the State of New York. See New York Judiciary Law (McKinney's Consol.Laws, c. 30, 1968) § 90. In the Erdmann case, supra, the Court of Appeals for the Second Circuit described the manner in which disciplinary proceedings are handled in New York:

> "Under § 90(2) of the New York Judiciary Law (McKinney's Consol.Laws, c. 30, 1968) the Appellate Division of each judicial department in the state is given the exclusive power to resolve issues as to alleged misconduct of attorneys practicing within its jurisdiction. To implement this power it is vested with authority to hold a hearing to determine the facts of the alleged misconduct and to apply to them the relevant standards of conduct laid down in the Code of Professional Responsibility. Although the court, for practical reasons, invokes the assistance of bar associations and their committees to investigate and conduct hearings with respect to complaints regarding members of the bar, just as a federal court may employ special masters to hear and report, Rule 53, F.R.Civ.P., the disciplinary power continues to rest exclusively with the court. Indeed, in the First Department if the Grievance Committee of the Bar Association of the City of New York recommends disciplinary action, it refers the matter to the Appellate Division, which then holds a trial *de novo* before any disciplinary action may be taken." 458 F.2d 1205, 1209.

See also West Cal.Bus. & Prof.Code, § 6107:

---

* We upheld the constitutionality of our disciplinary procedure in the face of a similar attack in In Re Goodrich, 88 S.D. 146, 216 N.W.2d 557.

"The proceedings to disbar or suspend an attorney, on grounds other than the conviction of a felony or misdemeanor, involving moral turpitude, may be taken by the court for the matters within its knowledge, or may be taken upon the information of another."

Finally, the respondent argues that the statutory procedure is unconstitutional as in fact applied to him. Respondent contends that this court participated in the investigatory stage of the proceedings against him by examining the report that had been filed with the grievance committee by the investigator. Respondent contends that it is manifestly unjust for a court which sits in final judgment in disciplinary proceedings to have considered hearsay information prior to referring the matter to a referee for hearing. Moreover, respondent contends that the record reflects that the hearsay information before the court must necessarily influence its judgment. He bases his contention upon the fact that in a letter to the chairman of the grievance committee, dated December 14, 1972, which acknowledged receipt of the committee's report and recommendation, the then presiding judge of this court referred to the comments made by the chairman of the grievance committee in his letter of December 12, 1972, concerning the investigator's report regarding the earlier revocation of respondent's real estate license. In his letter, the then presiding judge stated that he had reported the loss of respondent's real estate license to the grievance committee and had appeared before the committee suggesting that action be taken. He expressed his disappointment at the committee's refusal to recommend disciplinary action because of its belief that the loss of the real estate license had no relationship to the practice of law, a decision the then presiding judge thought had done nothing to enhance the prestige of the legal profession in Yankton County, South Dakota.

■ We conclude that what we have said above concerning respondent's facial attack upon the constitutionality of our disciplinary procedures answers his attack upon the constitutionality of those procedures as applied to him in the instant case. As we have said above, our preliminary review of the report of the grievance committee serves a dual purpose: it enables the court to screen out those charges that are clearly without merit, and it

also insures that some action will be taken on those charges which on the basis of preliminary investigation appear to merit formal proceedings. Our decisions in disciplinary cases are based upon the record made at the hearing before the referee, not upon the basis of the report and recommendation of the grievance committee or the Attorney General.

█ Likewise, the comments in the then presiding judge's letter to the chairman of the grievance committee express nothing more than a deep-seated concern about the necessity of proceeding with disciplinary action in those cases where a member of the bar has brought discredit upon the profession. We do not believe that the constitutional requirements of due process mandate that the highest court of a state must be relegated to the role of a passive bystander in the exercise of its responsibility of regulating the practice of law and safeguarding the public, dependent solely upon others for the investigation, review and prosecution of disciplinary actions and limited solely to the role of arbiter, a role properly reserved to the court in those cases involving civil and criminal litigation characterized by private and public institutional interests and which do not involve the court's duty to supervise its own officers. In saying this, however, we of course do not mean in any way to imply that lawyers should not and do not enjoy "first-class citizenship." Spevack v. Klein, supra. Rather, we emphasize the unique relationship between the court and the members of the bar and the responsibility of the court to maintain the traditionally high ethical standards of the profession.

We turn, then, to the facts upon which the referee based his recommendation that respondent be disbarred.

William J. Owens, a resident of Yankton County, South Dakota, was a long-time client of respondent's. On January 28, 1958, Owens executed a will that had been prepared for him by respondent. The will provided in part that:

"3) * * * The 2 charities to receive all my property are: 1) The First Methodist Church of Yankton, and 2) The Crippled Children's Hospital and School of Sioux Falls.

"4) Lester Michael is now and has been tenant on my farm. If he and his family want to stay on the farm (described above) they may buy it from the 2 charities on liberal terms. The price to be paid the charities will be the appraisal set by the state inheritance tax section of the Division of Taxation in Pierre under regular probate of this will. That amount he (the Michaels) may pay in fifty equal annual installments without interest, starting not later than noon a year following my death. But he (family) may pay faster—any amount at any time. And he must pay any taxes due at my death on the farm, and keep it insured as I now have it, and all taxes thereafter. If he defaults in payment of taxes insurance or installment payments in the slightest degree, he (family) must give up possession immediately to the 2 charities. And what he has paid up to that time is forfeited, considered rent, and his rights automatically end. My intention in doing this is to provide him and his family a home, not to permit him (them) to speculate. He must take up this offer within ninety days after my death by notifying my attorney G W Kunkle in writing. Thereupon my attorney will draw up a contract between the 2 charities and the Michaels' to carry out my intentions. That contract will be approved by the county court and recorded."

The will named Amelia Kunkle (respondent's wife) as executrix.

Owens died on November 26, 1965; a petition for probate was filed by Mrs. Kunkle on December 2, 1965, and letters testamentary were issued to her on December 21, 1965. An inventory and appraisement filed on January 5, 1966, showed the total assets of the estate as being of a value of $55,091.22, the principal portion of said assets consisting of a 235-acre farm, including buildings, located in Yankton County, which the appraisers valued at $45,000. A state inheritance tax report listing the same assets and values as contained in the inventory and appraisement was filed with the state on January 6, 1966.

On January 20, 1966, Lester and Darlene Michael (the Michaels), the persons referred to in the above quoted portion of Owens' will, filed an application for reappraisement of the real estate, alleging that the appraisers had valued the land in excess of its true and fair market value. Affidavits in resistance to said application were filed on behalf of the estate by respondent, on behalf of the First Methodist Church of Yankton (the Church) by its then attorney, Louis B. French, and on behalf of the Crippled Children's Hospital and School of Sioux Falls (the School) by its attorney, Louis R. Hurwitz. A hearing was held on February 15, 1966. On February 17, 1966, the judge of the county court issued a memorandum decision denying the motion for reappraisement; an order was subsequently entered to that effect.

On February 21, 1966, the Michaels notified the executrix of their intention to exercise their option to purchase the land as provided in the will.

On February 23, 1966, Lester Michael filed a creditor's claim in the amount of $361.03 for feeding and hauling livestock and for personal services rendered on behalf of the estate. On the same day Darlene Michael filed a creditor's claim in the amount of $11,100 for board, room, washing and sick care provided to Mr. Owens during the 111-month period from September 1, 1956, to November 26, 1965.

On April 18, 1966, the executrix filed what was denominated a first (90-day) account pursuant to SDC 35.1604 (now SDCL 30-25-11), which showed in part that she had paid on account an attorney's fee of $2,593.19, which included a $515.00 payment denominated "additional attorney fees 'Valuation' controversy," and an executrix' fee in the amount of $1,627.28, the latter paid on January 7, 1966. The Church and the School filed objections to the account and settlement, including the specific objection that "The accounting shows the attorney and executrix have been paid in full, when, in fact, their fees, respectively are not due until final settlement."

Following a hearing on April 29, 1966, the county court entered an order on May 9, 1966, which ordered the executrix to redraw her accounting, ordered that the executrix' fee shown in

the accounting as paid to the executrix be returned to the estate, and further ordered that one-half of the attorney's fee shown in the accounting as paid to the attorney of executrix be returned to the estate, together with the entire fee paid to said attorney with respect to the "valuation" controversy. The order also denied settlement of the 90-day account on the ground that such an account is for the information of the court.

On June 6, 1966, the executrix appealed the county court's order of May 9, 1966, to the circuit court. Although a motion to dismiss the appeal was filed by the Church on September 19, 1966, apparently nothing more was done with respect to the appeal until another motion to dismiss the appeal was filed by the Church and the School on December 19, 1967.

A hearing was held in circuit court on December 27, 1967. On January 16, 1968, the circuit court entered an order dismissing the appeal on the ground that the county court had been correct in refusing to settle the preliminary accounting filed by the executrix and on the ground that no substantial rights had been denied by the county court in refusing to settle said account.

On March 12, 1968, the executrix filed a notice of appeal to this court from the January 16, 1968 order of the circuit court. On August 26, 1968, the appeal was dismissed by this court on the ground that the appeal had been abandoned by reason of the fact that the record had not been settled within the time provided by law.

During the interim period from May 9, 1966 to the judgment entered on August 26, 1968 dismissing the appeal, certain other proceedings took place in the probate of the Owens estate. On May 10, 1966 a contract for deed, apparently unexecuted, was filed in the Owens estate file which provided that the Church and the School would convey to the Michaels the real estate in question for the sum of $45,000, payable "* * * not less than $450.00 to each of the 2 (first party above) or $900 total each year starting at or before noon the 26th of November 1966 * * * with no interest payable on the unpaid balance." The contract also stated that:

"* * * The provisions (of the will) particularly paragraph four are the *sole* basis of this contract for deed. And must be strictly followed. This is the only and entire agreement. No changes, especially no assignment by second parties permitted unless in writing signed by all and by the county court approved. Each party has received a true copy hereof at or before execution (signing)".

The Michaels acknowledged the execution of the contract on December 14, 1966; the President of the School acknowledged execution on November 24, 1967; the President of the Board of Trustees of the Church acknowledged execution of the contract on November 27, 1967.

On September 23, 1967 the Michaels filed a release of the above described creditors' claims in the amount of $11,100 and $361.03.

On January 22, 1969, Larry F. Hosmer, attorney for the Church (Mr. French died in June of 1967), filed an affidavit stating that the executrix had refused to comply with the order of the county court dated May 9, 1966 inasmuch as she had failed to return and restore to the estate the executrix' fees and attorney's fees as required by the order, and further stating that on at least three subsequent occasions the executrix had paid additional attorney's fees to her attorney in an amount totaling at least $1,802.12. The affidavit further stated that although repeated demands had been made upon executrix to file an accounting and to make the return and restoration of funds, respondent had continuously refused to file such an accounting unless the beneficiaries agreed in advance not to file any objections thereto. The affidavit asked that the executrix be held in contempt of court for disobeying the order of May 9, 1966, that she be ordered to return to the estate the fees paid by her to respondent subsequent to May 9, 1966, and that her letters testamentary be revoked. A citation and order to show cause was issued as prayed for in the affidavit. By an order dated February 19, 1969, the district county court found the executrix to be in contempt of court for her willful failure and refusal to comply with the order of the court dated May 9, 1966. The order gave

the executrix until March 10, 1969 to purge herself of such contempt by fully complying with the order of May 9, 1966 with respect to the return to the estate of the executrix' fees and attorney's fees paid, as provided in said order. The executrix was further ordered to return to the estate all attorney's fees paid by her subsequent to May 9, 1966. The order further provided that should the executrix not comply with the order her letters testamentary would be revoked. The order also directed the executrix to promptly make and file her final report and account and proceed with the closing of the estate upon her compliance with all of the provisions of the order.

Pursuant to this order, the executrix restored $4,983.50 to the estate.

On February 21, 1969, the executrix filed a final account and petition for distribution which, among other things, showed that on January 7, 1966, the executrix had been paid $1,627.28 and that for the period up to and including November 28, 1967, the attorney for the estate had been paid a total of $4,343.19 in fees for regular probate proceedings, the valuation trial, and with respect to the contested claims. The Church and the School filed objections to the final account, alleging that the executrix' fees were excessive and that the attorney's fees paid to respondent were grossly excessive and unreasonable. Following a hearing on March 5, 1969, the district county court entered an order on April 16, 1969 holding that the executrix' fees and attorney's fees which had been paid by the executrix were excessive. The order allowed a fee to executrix in the amount of $651.22 and a fee to respondent in the amount of $2,177.74. The order further directed the executrix to proceed forthwith to close the estate in accordance with the order.

On May 2, 1969, the executrix appealed from the April 16, 1969 order. On May 20, 1970 the attorney for the Church noticed the matter for trial on June 4, 1970.

Respondent testified at the June 4, 1970 trial in circuit court that subsequent to the restoration of the $4,983.50 to the estate and subsequent to the order of April 16, 1969, respondent had been paid $6,012.02, including sales tax, as attorney's fees.

Respondent's testimony at the June 4th trial also established that there had been a good deal of communication between him and Mr. Hurwitz concerning the closing of the estate and that respondent had steadfastly refused to close the estate unless Mr. Hurwitz and Mr. Hosmer would agree to waive all objections to the executrix' fees and the attorney's fees. There were introduced as exhibits certain letters from respondent to Mr. Hurwitz which respondent candidly admitted on cross-examination had been written for the purpose of inducing the Hospital and the School to withdraw their objections to the accounting filed by the executrix. For example, in response to a proposed stipulation submitted by Mr. Hurwitz which would have had the effect of enabling the executrix to close the estate without prejudice to the rights of any of the parties, respondent wrote a letter to Mr. Hurwitz on December 11, 1967, from which we quote the following:

> "* * * Before signing and returning (or returning unsigned) the stipulation etc. (above), you (both) are entitled to know the following.
>
> I am not (never have been) a price-cutter (of legal fees) . . . . The entire thrust (reason for) the ninety-day account was to lay a foundation for a ruling on this delicately vital (*vital*) question. To say it is in the interest of our profession is (I realize) to mouth the obvious. But it cannot be said too óften . . . I am not about to sign a paper to 'hold for naught' (gut) the foundation laid to require our supreme court (if it should go that far) to pass on the issues raised . . . The efforts of our late (notorious) pricecutter (to the contrary notwithstanding)
>
> UNLESS (that is) there is an *advance* approval of our proposed fees for legal services) . . . By the way, I am cheered by the decision of our supreme court dated (filed) 21 Nov. 1967 (LaFleur v. Odom) . . . But that decision does not go far enough . . .
>
> So if you (and Larry) care to approve our charges (legal fees)—and I shall gladly document them and answer

questions you have—I'll go along with your stipulation
. . . Your letter (by the way) is silent on the ques-
tion(s) I raised. I suggest you give answer so I may move
promptly"

On March 15, 1968, respondent wrote a letter to Mr.
Hurwitz, part of which reads as follows:

"* * * IT IS OUR SUGGESTION WE MEET
WITH YOU AND MR. MORRISON SOON TO REACH
AN ACCOMMODATION . . WE DO HAVE AN-
OTHER WILL IN THE SAFE NAMING YOUR
CLIENT (MR. MORRISON'S CHARITABLE COR-
PORATION) BENEFICIARY IN A SUBSTANTIAL
SUM

"YOU KNOW OF COURSE THE EASTER SEALS
STARTED THIS WORTHWHILE CHARITY WITH
TWO GIFTS OF $25,000 EACH SOME TIME AGO .
. . WITHOUT BRAGGING, YOU MAY OR NOT
KNOW I HAVE BEEN CHAIRMAN HERE SINCE
THE BEGINNING (1939) . . FACT IS, I TRIED
(UNSUCCESSFULLY) TO RESIGN MANY TIMES (AS
CHAIRMAN)

"IN THE LIGHT OF WHAT HAPPENED WHEN WE
FILED OUR NINETY-DAY ACCOUNT, THERE IS
NO SENSE IN A RERUN OF THAT EXPERIENCE
. . . SOMEONE FAILED TO RECKON WITH
HIS HOST, THAT'S ALL."

Then on August 19, 1968, respondent again wrote to Mr.
Hurwitz, from which letter we quote the following:

"* * * In making the suggestion (to you) that we
visit impersonally about these things before this gets out
of hand, I assumed you don't want a 'redo' of the EN-
GEBRITSEN case that went to our supreme court 8
times (before Berdahl and Danforth had enough)

"But we will prepare the final account etc. on the
theory you'll come in at the hearing and object to our
fees . . . but again I renew the suggestion we try

head this off by a friendly visit at your convenience (time & place) . . . as I told you on the phone, maybe I (we) are overlooking something"

On August 19, 1970, the circuit court entered a judgment allowing a fee to the executrix in the amount of $404.88 and allowing attorney's fees to the respondent in the amount of $2,467.74. The judgment further ordered the executrix to forthwith restore to the estate all sums paid to herself as executrix and to her attorney as attorney's fees in excess of the foregoing allowances, together with interest from the date of entry of judgment, and ordered the executrix to forthwith make a proper accounting and proceed with the distribution and closing of the estate.

On October 9, 1970, the executrix appealed to this court from the August 19, 1970 judgment of the circuit court. On April 5, 1971, this court entered an order dismissing the appeal for the reason that appellant's brief had not yet been filed, the record having been settled on November 27, 1970.

On November 17, 1971, attorney Hosmer submitted an affidavit to the district county court stating that the executrix had failed to comply with the August 19, 1970 order of the circuit court. A citation was issued requiring the executrix to show cause why she should not be held in contempt. Following a hearing on December 13, 1971, the district county court orally ordered the executrix to return to the estate the executrix' fees and attorney's fees which were in excess of those fees allowed by the August 1970 order of the circuit court, together with interest on the excess fees from August 19, 1970. The executrix complied with this order on December 17, 1971, by restoring to the estate account the sum of $5,080.55, consisting of $4,704.21 principal and $376.34 interest. The court entered an order on January 7, 1972 which adjudged the executrix to be in contempt of court and which provided that she might purge herself of such contempt by preparing and serving a supplemental final accounting no later than January 14, 1972.

The executrix filed a supplement to the final account. Certain concessions were made by Mr. Hosmer whereby respon-

dent was allowed certain expenses in exchange for his agreement not to take further appeals and to accept the order of the circuit court as to fees. On March 1, 1972 a decree of distribution was entered distributing the assets of the estate to the Hospital and the School. On April 14, 1972 an order was entered discharging the executrix.

The referee found that as a result of the proceedings as described above, primarily relating to fees, the beneficiaries were required to wait more than five years to receive title to the property and payment of the cash assets. The referee found that the estate was not complicated and could properly have been probated in less than one year. The referee also found that the estate was unduly held open because respondent would not close it until and unless his claims for excessive fees and those of his wife, the executrix, were agreed upon in advance.

From these findings the referee concluded that respondent had resorted to frivolous appeals, which were abandoned or dismissed, from orders denying unreasonable compensation and that these appeals were an artifice to cause delays. The referee concluded that respondent had applied the frustration resulting from his induced delays as leverage to extract agreements from those interested in closing the estate for allowances of such compensation. The referee concluded that because contempt proceedings were necessary to effect restoration of the amounts ordered to be restored to the estate, respondent had failed to maintain the respect due the courts. From all of the foregoing, the referee concluded that the conduct and incompetency exhibited by respondent in his handling of the Owens estate was such as to render him dangerous for clients who might seek his assistance as an attorney and that it tended to unjustly tarnish the image of the vast majority of lawyers who serve their clients with a high measure of dedication.

We agree fully with the referee's findings and conclusions. Although we have set forth at some length the sequence of events in the Owens estate which were admirably summarized in the referee's supplemental findings, it is difficult to describe accurately the confused record in the probate proceedings. It is difficult to determine from the several accountings the exact

amount of the fees that were paid to the executrix and to the respondent at various stages of the proceedings; however, the discrepancies, if any, in the dollar amounts are not material inasmuch as it is the overall pattern followed by respondent that determines the seriousness of the charges against him with respect to his handling of the estate.

In his defense, respondent maintains that all of the actions that he took were designed to fulfill the duty of the executrix in carrying out the testator's intent. In support of this claim, respondent repeatedly refers to a so-called "secret agreement" allegedly entered into between the beneficiaries and the Michaels whereby the Hospital and the School agreed to convey the land in question to the Michaels for a cash payment totaling $17,000, which included the $900 already paid by the Michaels to the estate, and the Michaels agreed to withdraw the claims that they had filed against the estate. Respondent contends that this secret agreement flew in the very face of the testator's intent that the Michaels should be permitted to purchase the land only upon the terms set forth in paragraph 4 of his will.

The record does not support respondent's claim that his appeals to the circuit court and to this court and his actions in accepting payments of additional attorney's fees in the clear face of court orders to the contrary were taken for the sole purpose of carrying out the testator's intent. We see no logical connection between respondent's claim that he was attempting to uphold the testator's intent and his action in taking appeals from orders limiting the amount of the executrix' and attorney's fees. Nor do we see any connection between his claimed intent to uphold the terms of the will and his action in disregarding the orders of the court to restore the executrix' and attorney's fees to the estate. Respondent acknowledged at the June 4, 1970 circuit court hearing that he had advised the executrix on legal questions throughout the course of the probate proceedings. We must keep in mind that the relationship between the executrix and respondent in this case was not that found in the usual case where the executor or executrix is unrelated to the attorney handling the estate. It would fly in the face of all human experience to suppose that respondent acted as a mere scrivener for his wife. Indeed, even if this had been the case, it would hardly have lessened

respondent's responsibility as an officer of the court to abjure those dilatory tactics which were clearly designed to achieve the purpose of maximizing the executrix' and attorney's fees.

If the agreement between the beneficiaries and the Michaels was in any way inconsistent with the terms of the will, and we certainly do not intimate that it was, and if respondent had desired to take some action to prevent the consummation of the agreement, he made no efficacious attempt to pursue a legal remedy. In short, respondent's claim that he was seeking to uphold the intent of the testator appears to us to be nothing more than an afterthought to justify his otherwise dilatory tactics.

Having concluded that the referee's findings are supported by the clear preponderance of the evidence, we come, then, to the matter of determining whether respondent's conduct was of such a nature as to merit the ultimate discipline of disbarment. SDCL 16-19-2 provides that:

> "The following are sufficient causes for revocation or suspension of an attorney and counselor's license: * * *
>
> (3) Willful violation of any of the duties of an attorney or counselor as prescribed in chapter 16-18;"

The referee concluded that because respondent could not get direct approval for his request for fees, he resorted to appeals as an artifice to cause delays. SDCL 16-18-19 provides that:

> "It is the duty of an attorney and counselor at law to employ, for the purpose of maintaining the causes confided to him, such means only as are consistent with truth, and never seek to mislead the judges by any artifice or false statement of fact or law."

The referee concluded that respondent had used the frustration resulting from the frivolous appeals as leverage to extract agreements from those interested in closing the estate for allowance of his fees, this in violation of SDCL 16-18-17 and SDCL 16-18-26(2). The first of these sections provides that:

> "It is the duty of an attorney and counselor at law not to encourage either the commencement or continuance of an action or proceeding from any motive of passion or interest."

SDCL 16-18-26 provides that:

> "Every attorney at law who:   *   *   *
>
> (2) Willfully delays his client's suit with a view to his own gain   *   *   *   shall be guilty of a misdemeanor."

The referee concluded that by failing to comply with the order of the court which directed him to restore excessive fees and by taking an additional payment of fees, necessitating contempt proceedings to effect the restoration of the combined amounts, respondent had failed to maintain the respect due the courts as required by SDCL 16-18-13, which provides that:

> "It is the duty of an attorney and counselor at law to maintain the respect due to the courts of justice and judicial officers."

We agree with the referee's conclusion that respondent was guilty of violating the above mentioned statutes and that such violation is cause for his disbarment. The purpose of a disciplinary proceeding is not to punish an attorney but to remove from the profession a person whose misconduct has proved him unfit to be entrusted with the duties and responsibilities belonging to the office of an attorney, State v. Kirby, 36 S.D. 188, 154 N.W. 284; In re Goodrich, 78 S.D. 8, 98 N.W. 2d 125, and for the purpose of protecting the public from further wrongdoing on the part of an attorney, In re Egan, 36 S.D. 228, 154 N.W. 521. Disbarment is warranted when it is clear that the protection of society requires such action or when the maintenance of the respect due courts and judges or of the respectability of the legal profession itself demands such action. State v. Kirby, supra; In re Wilmarth, 42 S.D. 76, 172 N.W. 921.

We are mindful of the fact that respondent is a long-time member of the profession, having been admitted to the State Bar

of South Dakota on August 1, 1932 and having practiced law in Yankton, South Dakota since that time. He is no novice and may not claim inexperience or youthful zeal as an excuse for the conduct which we conclude was a clear violation of an attorney's duty to uphold the high ethical standards of the profession. One cannot study the record in the Owens estate, and indeed, study it one must in order to understand it, without coming away with a firm and definite conviction that respondent used the processes of the courts to further his own personal financial gain, as well as his wife's, at the expense of his client, the estate, and at the expense of the beneficiaries of the estate. We agree with the referee's conclusion that respondent's conduct in the handling of the Owens estate was such as to render him dangerous to clients who may seek his assistance as an attorney and to unjustly tarnish the image of the vast majority of lawyers who serve their clients with a high measure of dedication. In re Egan, 22 S.D. 355, 117 N.W. 874.

Judgment of disbarment will be entered.

All the Justices concur.

HANSON, Retired Justice, sitting for BIEGELMEIER, C. J.